## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| RUMBLE INC. and TRUMP MEDIA & TECHNOLOGY GROUP CORP. | Civil Action No. <u>8:25-cv-411</u> |
| Plaintiffs, | <u>**COMPLAINT**</u> |
| v. | **Demand for a Jury Trial** |
| ALEXANDRE DE MORAES, Justice of the Supreme Federal Tribunal of the Federative Republic of Brazil | **Permanent Injunctive Relief Requested** |
| Defendant. | |

Plaintiffs Rumble Inc. ("Rumble") and Trump Media & Technology Group Corp. ("TMTG") (together, the "Plaintiffs") bring this action against Alexandre de Moraes, Justice of the Supreme Federal Tribunal of the Federative Republic of Brazil ("Justice Moraes"), and in support state as follows:

### <u>INTRODUCTION</u>

1. Rumble and TMTG bring this action to stop Justice Moraes's *ultra vires* attempts to illegally censor American companies operating primarily on American soil.

2. Acting under the guise of the Supreme Federal Tribunal of the

Federative Republic of Brazil ("STF"), Justice Moraes has issued sweeping orders to suspend multiple U.S.-based accounts ("Banned Accounts") of a well-known politically outspoken user ("Political Dissident A"), ensuring no person in the United States can see his content ("Gag Orders").

3.    The Gag Orders, as issued, censor legitimate political discourse in the United States, undermining fundamental constitutional protections enshrined in the First Amendment, clashing with the Communications Decency Act, and defying basic comity principles.  The Gag Orders further require Rumble, a Florida-based company with no personnel or assets in Brazil, to designate a legal representative in Brazil solely for the purpose of accepting service of the Gag Orders and submitting to Justice Moraes's authority.

4.    Rumble and TMTG jointly seek a judgment declaring Justice Moraes's Gag Orders unenforceable in the United States.  Allowing Justice Moraes to muzzle a vocal user on an American digital outlet would jeopardize our country's bedrock commitment to open and robust debate.  Neither extraterritorial dictates nor judicial overreach from abroad can override the freedoms protected by the U.S. Constitution and law.

## **THE PARTIES**

5.    Plaintiff Rumble is a Delaware corporation with its principal place of business in Longboat Key, Florida.  Through its subsidiaries, Rumble owns

and operates a video (rumble.com) and cloud hosting environment designed to foster robust discussion of different viewpoints and opinions.

6.    TMTG is a Delaware corporation with its principal place of business in Sarasota, Florida.  TMTG, through a wholly owned subsidiary, operates the Truth Social platform, a forum designed to facilitate open discourse and uphold the American tradition of free expression for its users.

7.    Truth Social relies on Rumble's cloud-based hosting and video streaming infrastructure to deliver multimedia content to its user base.  If Rumble were to be shut down, that shut down would necessarily interfere with Truth Social's operations, as well.

8.    Defendant Justice Moraes is a member of the STF, the highest court in Brazil.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the First Amendment to the U.S. Constitution; the Communications Decency Act ("CDA"), 47 U.S.C. § 230; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.  An actual controversy exists regarding Justice Moraes's extraterritorial Gag Orders that require censorship of lawful content within the United States, conflicting with Plaintiffs' First Amendment and statutory rights.

10.    Alexandre de Moraes, a Justice of the STF, has purposefully

directed his conduct toward Florida-based corporations and their servers, data centers, operations, and user relationships located in this District. He attempted to enforce the Gag Orders by sending them via email to Rumble's legal counsel in Florida (legal@rumble.com). The Gag Orders demand the suspension and prohibit the creation of accounts, require Rumble to turn over account-holder information, impose daily fines, and compel potential shutdowns of Rumble—a Florida corporation with servers located in this District. Compliance with the Gag Orders would require Rumble to make changes to those servers, which would directly harm TMTG—whose global online platform depends, in part, on those servers and is also based in Florida. The Gag Orders therefore directly interfere with Plaintiffs' operations, relationships, and speech in Florida. Additionally, the impact of the daily penalties would be felt by Rumble at its corporate headquarters in Florida. The Gag Orders also require Rumble, whose management resides in this District, to designate an agent to accept legal process in Brazil, thereby submitting to Justice Moraes's authority. These acts satisfy the minimum contacts test, conferring personal jurisdiction consistent with due process.

11.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to the claims alleged in this Complaint occurred in this District. Both Rumble and TMTG have their principal place of business in this District, Rumble's servers reside in this

District, and compliance with the Gag Orders would occur in this District.  By targeting these in-district operations, Justice Moraes's censorship orders directly harm Rumble's and TMTG's constitutionally protected speech and lawful platform activities within the Middle District of Florida.

12.    As a Justice of the STF, Justice Moraes is an official of the Brazilian government.   While foreign states and their agencies and instrumentalities typically enjoy immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611, the FSIA does not apply to an official purportedly "acting on behalf of the foreign state[.]"  *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010).  Any claim of immunity by a foreign official instead is governed by common-law principles.

13.    Under the common law of foreign sovereign immunity, an official is entitled to immunity only for acts performed in his or her official capacity, and only where exercising jurisdiction over that official would be akin to enforcing a rule of law against the foreign state.  An official does not act in his or her official capacity where the challenged acts are outside the scope of that official's authority—*i.e.*, the acts are *ultra vires*.  Foreign officials therefore are not entitled to immunity for *ultra vires* acts.  Even where the challenged acts are within the scope of the official's authority, immunity is still unavailable if the relief requested would not have the effect of enforcing a rule of law against the state.

14.    As alleged herein, the blatantly unlawful Gag Orders are plainly outside the scope of Justice Moraes's authority under both Brazilian law and multiple treaties between the United States and Brazil.  On that basis alone, the legality of the Gag Orders, and Justice Moraes's unlawful conduct in issuing them, are not immune from the scrutiny of the courts of the United States.  But even if Justice Moraes's issuance of the Gag Orders could be deemed within the scope of his legitimate and lawful authority, the relief that Plaintiffs seek here—declaratory and injunctive relief prohibiting Justice Moraes from enforcing the Gag Orders in the United States—would not be akin to enforcing a rule of law against the government of Brazil.  The Court thus has subject-matter jurisdiction and may properly exercise authority over the claims and relief sought in this action.

## FACTUAL ALLEGATIONS

## I.    Rumble and TMTG Promote Free Speech

15.    Rumble was founded in 2013 as a video-sharing service dedicated to free speech, open discourse and debate.  Rumble began its beta cloud hosting services in 2022, with a public launch in 2024.

16.    From its earliest days, Rumble intentionally set itself apart from larger service providers by providing a user-friendly environment in which controversial or unconventional viewpoints would not be censored unless it was unlawful or violated Rumble's content moderation policy and terms of service.

17.   By 2021, Rumble had evolved into a thriving haven for independent content creators—ranging from citizen journalists to educators—who sought an alternative to mainstream tech providers perceived as overzealous in censoring legally protected viewpoints.  In doing so, Rumble cultivated a robust user community and became widely regarded as a key counterbalance to those bigger service providers whose restrictive policies had begun to erode public trust in the marketplace of ideas.

18.   Rumble has a comprehensive content moderation policy that it rigorously enforces and continues to abide by applicable U.S. laws while steadfastly protecting its users' freedom of expression.  As a neutral company with transparent policies and innovative cloud services, Rumble stands today as a respected, fast-growing presence in the digital publishing sphere, welcoming a broad array of perspectives that enrich the global exchange of information.

19.   Truth Social was launched in 2022 as an online platform expressly rooted in American First Amendment values, with the stated mission of opening up the Internet and giving people their voices back.  Truth Social was established as a safe harbor for free expression amid increasingly harsh censorship by other platforms.

20.   Truth Social avoids blanket deplatforming or shadow banning of lawful content that complies with its Terms of Service—opting instead for what

TMTG believes is a robust, fair, and viewpoint-neutral discretionary moderation system that is consistent with TMTG's objective of maintaining a public, real-time platform where any user can create content, follow other users, and engage in an open and honest global conversation without fear of being censored or cancelled due to their political viewpoints.

21.    TMTG has placed emphasis on building a platform for users to freely express themselves through Truth Social; its brand and business model is built on distinguishing itself from other platforms that have engaged in various forms of censorship, including unjustified bans of user accounts at the behest of government officials.

22.    Neither Rumble nor TMTG has any entities, operations, employees, bank accounts, or businesses in Brazil.

23.    In 2021, Rumble and TMTG entered into a Cloud Services Agreement.  Pursuant to this agreement, Rumble has served as Truth Social's primary video-streaming and hosting provider since 2022.  Truth Social relies, in part, on Rumble's technology infrastructure to deliver its services—including videos embedded in Truth Social posts to Truth Social's users.  As a result, if Rumble were to be shut down in Brazil, Truth Social's ability to deliver its service to Truth Social users in Brazil would be adversely affected.

## II.    Justice Moraes Leads a Sweeping Campaign to Silence Political Dissent

24.    In 2017, Justice Moraes ascended to the STF following a plane crash that killed his predecessor, Justice Teori Zavascki.  Justice Zavascki had been presiding over Operation Car Wash ("Lava Jato"), a multi-billion-dollar investigation central to Brazil's anti-corruption drive.

25.    Although Justice Moraes had no prior experience serving as a judge, the Brazilian Senate confirmed his appointment on February 22, 2017, and he was sworn in the following month.

26.    In March 2018, a major Brazilian newspaper reported that Justice José Antonio Dias Toffoli—a colleague of Justice Moraes on the STF—was implicated in Operation Car Wash and linked to Odebrecht (a conglomerate that admitted to roughly US $788 million in bribes).

27.    Within three days of that exposé, on March 14, 2019, the STF—via Justice Toffoli—launched Inquiry No. 4781, known as the "Fake News Inquiry."  The STF invoked Article 43 of the STF's Internal Regulations, an Article that had generally been reserved for administrative matters, to unilaterally empower itself to open a criminal-style probe *ex officio*, bypassing the Public Prosecutor's Office.  Critics in Brazil and abroad blasted this as unconstitutional, warning that the STF, the highest court in the land, was effectively granting itself the roles of investigator, prosecutor, and judge under

the banner of combating "fraudulent news, offenses and threats" against the STF and its justices.[1]

28.    Justice Moraes led the STF's first inquiry, and his first action was to order the removal of an article implicating Justice Toffoli and threatening a daily fine of R $100,000 (about US $20,000) unless it was removed from the internet.

29.    Although Justice Moraes has publicly professed a "minimalist" approach to online platform regulation—once calling for a "free market of ideas"—he also blames platforms for "allow[ing] themselves to be used" by what he calls "right wing extremists."[2]

30.    Under Justice Moraes's stewardship, sealed orders have become routine, compelling U.S.-based online service providers to ban politically outspoken users across their entire platform, including in the United States, based on allegations of "criminal" or "anti-democratic speech," all while threatening hefty daily fines or outright shutdowns.  Because these proceedings are sealed, users often receive no notice or hearing prior to being purged.

---

[1] *Unveiling Authoritarianism: The 'Fake News Inquiry' in Brazil and Its Inquisitional Assault on the Rule of Law*, HUMAN RIGHTS HERE (Jan. 5, 2024), https://www.humanrightshere.com/post/unveiling-authoritarianism-the-fake-news-inquiry-in-brazil-and-its-inquisitional-assault-on-the-rule-of-law.

[2] *Brazil Judge Who Battled Elon Musk Says Social Media Poses Risk to Democracy*, FINANCIAL TIMES (Dec. 5, 2024)  https://www.ft.com/content/091839c5-41b7-49be-ae35-47f15ce22e5f.

31.    In a single 2020 episode, Justice Moraes forced the removal of 16 X (formerly Twitter) accounts and 12 Meta (Facebook) accounts tied to prominent supporters of former Brazilian President Jair Bolsonaro, using "disinformation" claims to justify the purge.

32.    Since 2022, Justice Moraes has reportedly mandated the suspension of nearly 150 accounts, targeting critics of current Brazilian President Luiz Inacio "Lula" da Silva, including conservative legislators, journalists, jurists, and even musical performers.

33.    In October 2022, Elon Musk purchased X, promising more open moderation than under its prior management.  This clashed directly with Justice Moraes's demands to remove accounts he labeled "anti-democratic." Almost immediately after Musk's takeover, Justice Moraes imposed sealed orders demanding the removal of accounts with tight compliance deadlines and thousands in daily fines.  Musk denounced these demands as an abuse of power and infringement on free speech, vowing that X would only remove posts clearly violating U.S. law.   In response, Justice Moraes threatened X's Brazilian legal representative with arrest and ordered the platform blocked nationwide.  Musk faced a criminal investigation for alleged obstruction of justice after refusing to comply.

34.    In September 2024, in an effort to increase the pressure on X and compel payment of X's fines (which at that point exceeded US $3 million),

Justice Moraes ordered the freezing of Starlink bank accounts in Brazil. In response, X stated "Regardless of the illegal treatment of Starlink in freezing our assets, we are complying with the order to block access to X in Brazil. We continue to pursue all legal avenues, as are others who agree that @alexandre's recent order violates the Brazilian constitution."

35.    X eventually yielded, paying around US $5 million in fines so Brazilians could regain access to the platform.

36.    Justice Moraes also pursued other high-profile targets. One such figure is Paulo Figueiredo, a conservative commentator who openly questioned the breadth of "anti-democratic" speech rules and criticized Justice Moraes's reliance on sealed directives. Until December 30, 2022, Figueiredo regularly appeared on Brazil's JP News, a top-rated television network. Figueiredo built a massive digital following—1.4 million on Twitter, 1.1 million on YouTube, and 800,000 on Instagram—and gained influence by dissecting STF actions and controversial policies. His posts often went viral, prompting intense debate in both Brazil and among diaspora communities. As Figueiredo's critiques reached U.S. audiences, he emerged as a bridge connecting American free-speech ideals with the Brazilian discourse. By challenging the notion of "anti-democratic" content, Figueiredo became a prime target for Justice Moraes's sealed takedowns.

37.    In December 2022, in the midst of intense debate over the October

2022 Brazilian presidential election, online platforms and service providers received Justice Moraes's sealed instructions to block all of Figueiredo's networks within two hours—on penalty of severe fines—erasing him from an audience of millions.  At the same time, Justice Moraes froze Figueiredo's assets (despite the fact he was a U.S. legal permanent resident) and voided his passport, demonstrating a systematic effort to punish and deter lawful expression.

38.    On April 17, 2024, a U.S. House Judiciary Committee and Select Subcommittee on the Weaponization of the Federal Government staff report titled "The Attack on Free Speech Abroad and the Biden Administration's Silence: The Case of Brazil" documented Justice Moraes's escalating conduct. The report identified 51 separate takedown orders that Justice Moraes issued to X and 37 issued by the Superior Electoral Court of Brazil.  It highlighted how sealed directives and the threat of punitive fines—often tens of thousands of dollars per day—systematically forced online video sharing platforms and service providers to expunge accounts and silence law-abiding voices.  The House report noted that Justice Moraes specifically sought to ban high-profile critics across multiple networks, illustrating the breadth of the campaign and the harsh penalties faced by anyone whom Justice Moraes deems "anti-democratic."

39.    These revelations confirm that Justice Moraes's sweeping orders—

backed by severe enforcement mechanisms—systematically quash dissent under the broad pretexts of "fake news," "disinformation," or "anti-democratic" speech. On their face, the directives purport to safeguard electoral integrity or protect democracy, yet in practice they target independent voices, erase public debates, and wield daily fines or asset freezes to coerce compliance. Such sealed proceedings and secret blacklists go far beyond mere content moderation, forming a deliberate, punitive campaign to eradicate legitimate dissent and solidify Justice Moraes's dominance over Brazil's public discourse.

40.    If Justice Moraes's actions were confined to Brazil, they would be regrettable, and likely not in the province of U.S. Courts. But many of Justice Moraes's actions, including the illegal Gag Orders challenged here, reach directly into the United States to compel action by U.S. companies having no presence in Brazil, and which will have the effect of suppressing speech not just in Brazil, but in the United States and throughout the world.

## III.    The U.S. and Brazil Have Established Legal Channels to Serve and Enforce Judicial Orders That Justice Moraes Has Violated

41.    There are, of course, lawful means for a court in one country to serve its orders on a citizen and resident of another country.

42.    The United States and Brazil are parties to the Mutual Legal Assistance Treaty ("MLAT") in criminal matters, which entered into force on February 21, 2001. The MLAT establishes clear procedures for the exchange

of information, service of documents, and enforcement of orders in criminal investigations involving cross-border issues. Among the tools available under the MLAT are provisions for serving documents (Article 13), obtaining testimony or evidence (Article 8), and conducting searches and seizures (Article 14), all of which must be channeled through the designated Central Authorities: the U.S. Department of Justice and Brazil's Ministry of Justice.

43.    In addition to the MLAT, Justice Moraes could have used the Hague Service Convention (to which both the United State and Brazil are signatories) or the traditional process of letters rogatory to lawfully serve and enforce his orders in the United States. These mechanisms are well-established, internationally recognized, and adhere to the principles of sovereign consent. The Hague Service Convention provides a streamlined framework for cross-border service of judicial documents. Letters Rogatory involve formal requests through diplomatic channels for judicial assistance, subject to the approval of the courts in the country where assistance is sought.

44.    These mechanisms are grounded in mutual respect for sovereignty and ensure that legal orders originating in one country are processed in a manner consistent with the laws and constitutional protections of the other. They preserve the integrity of international cooperation while respecting each country's sovereignty and preventing overreach by foreign judicial actors.

45.    As set forth below, Justice Moraes knowingly and intentionally

circumvented each of these mechanisms in issuing the Gag Orders.

## IV.    U.S. Law and Public Policy Opposes Censorship and Judicial Overreach

46.    The United States has long upheld free speech as a cornerstone of its constitutional framework, enshrined in the First Amendment, and has consistently opposed censorship, particularly when imposed extraterritorially by foreign governments.

47.    Vice President JD Vance's speech at the Munich Security Conference on February 14, 2025, reaffirmed these principles as a critical component of U.S. public policy.  Speaking before a global audience, Vice President Vance articulated the U.S. commitment to defending free expression against judicial overreach and authoritarian measures cloaked under the guise of combating "misinformation" or "anti-democratic speech."

48.    Vice President Vance explicitly condemned judicial censorship, stating, "we know very well in America that you cannot win a democratic mandate by censoring your opponents or putting them in jail, whether that's the leader of the opposition, a humble Christian praying in her own home, or a journalist trying to report the news."  His remarks emphasized the incompatibility of true democratic governance with practices that suppress dissent, restrict lawful expression, or penalize opposition viewpoints.  He warned that such measures undermine not only domestic freedoms but also

global confidence in democratic institutions. These statements underscore a U.S. policy framework that categorically rejects the enforcement of foreign censorship orders, such as those issued by Justice Moraes, on U.S.-based service providers like Rumble and platforms like Truth Social.

49.    The Vice President, in outlining U.S. policy, further noted that free speech is essential to a functioning democracy, even when it involves controversial or unpopular viewpoints. He highlighted the dangers of delegitimizing lawful discourse through overbroad censorship mechanisms, warning that such actions erode the very principles they purport to protect. By asserting that "democracy rests on the sacred principle that the voice of the people matters," Vice President Vance underscored the need to resist extraterritorial dictates that seek to silence lawful speech within the United States.

50.    The United States' longstanding opposition to foreign judicial overreach is further reinforced by Executive Order 14203, issued on February 6, 2025. This order underscores the U.S. government's unequivocal commitment to protecting its citizens, entities, and allies from illegitimate foreign judicial actions. Specifically targeting the International Criminal Court ("ICC"), the EO 14203 denounces attempts by the ICC to assert jurisdiction over U.S. or allied persons without U.S. consent, describing such actions as a direct affront to U.S. sovereignty and national security. EO 14203

establishes a U.S. policy framework that rejects foreign judicial attempts to impose their legal standards extraterritorially—standards that conflict with U.S. constitutional protections and established legal norms.

## IV.    Justice Moraes's Judicial Overreach Targets Rumble on American Soil

51.    Political Dissident A is a U.S.-based conservative Brazilian commentator and blogger, known for founding media outlets critical of the STF.  He built a sizable online following by advocating for free-speech principles and voicing strong support for former Brazilian President Bolsonaro's administration.  This included a YouTube channel with over 1.3 million followers.

52.    Over time, Political Dissident A's reporting and commentary clashed with Justice Moraes's views, which he criticized as overreaching and politically biased.  As a result, Justice Moraes began attacking Political Dissident A through censorship orders and criminal investigations into his allegedly "anti-democratic" speech.  In 2021, Political Dissident A fled Brazil after Justice Moraes issued a warrant for his arrest for the crime of "spreading misinformation" and "criticizing the Supreme Court," activities that are, of course, First Amendment-protected free speech in the United States.  Political Dissident A sought political asylum in the United States, where he remains.

53.    In March 2024, the United States rejected Brazil's request to

extradite Political Dissident A, an exiled journalist now living in the United States, determining that the charges against him were "crimes of opinion" protected under the First Amendment and did not qualify as extraditable offenses under the U.S.-Brazil MLAT, and thus that there were no valid grounds for extradition.

54. In February 2025, Justice Moraes issued sealed Gag Orders commanding Rumble to block the accounts of Political Dissident A within two hours and to "not . . . authorize the creation of any new accounts" or otherwise face a daily penalty of R$50,000 (almost US $9,000) and a shutdown of Rumble in Brazil. The Gag Orders also require "the immediate suspension of the transfer of values originating from monetization, services used for donations, payment of advertisements, and the subscription of supporters, and originating from monetization from lives, including those carried out through the provision of transmission keys to the channels/profiles."

55. The Gag Orders vaguely assert that Political Dissident A is using online video platform service providers and networks "as true protective shields for the practice of illegal activities, giving the investigated a true clause of criminal indemnity for the commission of crimes already indicated by the Federal Police." The alleged crime is "showing no restriction in propagating his criminal speeches." The orders do not identify any "criminal" speech.

56.    The Gag Orders also do not limit their scope to Brazilian audiences; they impose a complete ban on Political Dissident A's content, regardless of geographic reach or the lawful nature of the commentary under American free-speech standards.  The Gag Orders demand that Rumble, from its Florida-based headquarters and without any Brazil operations, enforce a universal ban on the targeted accounts—imposing a total blackout that extends even to U.S. users.  This is not merely a takedown of specific content, but an across-the-board prohibition on any speech, backed by escalating daily fines and the looming threat of a forced shutdown of Rumble's online video sharing and cloud hosting services.  The risk of a Rumble shutdown beyond Brazil's borders is heightened by Justice Moraes's known practice of ordering tech giants (like Google and Apple) to take actions to enforce his orders, such as removing noncompliant apps from their stores under the same punishing penalties.

57.    The Gag Orders also require Rumble, a U.S.-based company with no presence or operations in Brazil, to appoint local attorneys solely for the purpose of accepting service of Justice Moraes's censorship mandates (and the corresponding penalties), and to otherwise fall under the authority of Justice Moraes.

58.    This extraterritorial censorship thus exerts a direct, tangible impact on both Rumble and TMTG.  Rumble—with its headquarters, key

physical servers, and technical infrastructure located on American soil—is subject to crushing fines or an outright ban if it defies Justice Moraes's Gag Orders. The stakes are magnified by the possibility that Justice Moraes may pressure Google or Apple to remove the Rumble app from their app stores entirely, effectively banning it from U.S. devices, as well as other third service telecom providers to shut down Rumble. As a result, Truth Social—which depends, in part, on Rumble's technology—risks operational challenges in the United States.

59. Because Truth Social relies on Rumble's back-end services—including cloud hosting, user logins, and video streaming—for Truth Social, these extraterritorial demands threaten to erase lawful American speech and disrupt Truth Social's core functionality within the United States. Should Rumble be forced into compliance—or face broad, unspecified expulsion from the Brazilian market and elsewhere pursuant to orders from Justice Moraes—Truth Social would endure challenges to its ability to publish and share content.

60. These directives, issued through sealed proceedings in Brazil, impermissibly extend Brazilian judicial power into lawful U.S. activities—upending Rumble's and TMTG's ability to deliver First-Amendment protected content domestically. Should companies like Google or Apple comply with Justice Moraes's extraterritorial demands, the shutdown could intensify,

depriving American service providers like Rumble and platforms like Truth Social of lawful expression and shutting off millions of U.S. users from robust political debate.

## V.    The Gag Orders Are *Ultra Vires* Acts

61.    Justice Moraes's *ultra vires* actions to bypass the MLAT, the Hague Service Convention, and the traditional letters rogatory process were not accidental or inadvertent but deliberate and calculated.  Justice Moraes is a highly sophisticated jurist who has used these legal mechanisms dozens of times.    These mechanisms provide well-established, internationally recognized frameworks for addressing cross-border legal matters, ensuring that requests from foreign judicial authorities are reviewed for compliance with the laws and constitutional protections of the receiving nation.  By intentionally circumventing all three frameworks, Justice Moraes demonstrated a clear understanding that his overbroad, vague, and extraterritorial demands would not survive scrutiny under any lawful process.

62.    Under the MLAT, any request for document service, testimony, or enforcement must be routed through the designated Central Authorities of both nations: the U.S. Department of Justice and Brazil's Ministry of Justice. This process is specifically designed to uphold principles of sovereignty and comity, requiring that each nation evaluate whether the request aligns with

its domestic laws and public policy.

63.     Recognizing that his demands would likely fail under the MLAT's rigorous review process, Justice Moraes devised a coercive strategy to bypass the treaty entirely.  Rather than submitting a formal request through the proper channels, Justice Moraes issued orders compelling Rumble, a U.S.-based company with no presence or operations in Brazil, to appoint local attorneys solely for the purpose of accepting service of his censorship mandates.  This maneuver not only contravenes the procedural requirements of the MLAT but also fabricates jurisdiction through coercion, violating the treaty's core principles and undermining the integrity of international legal cooperation.  Coercion is certainly the right word.  For example, when X originally defied Justice Moraes's censorship orders, he threatened to have X's legal representatives there arrested, resulting in X evacuating its Brazilian staff from the country.

64.     The Hague Service Convention, to which both Brazil and the United States are signatories, provides an alternative, streamlined framework for cross-border service of judicial and extrajudicial documents.  This treaty ensures that legal requests are processed in a manner consistent with the sovereignty of the receiving country while protecting individuals and entities from improper or unauthorized foreign judicial orders.  By circumventing the Hague Service Convention, Justice Moraes further

23

demonstrated his disregard for established international rules and norms. The Convention's procedural safeguards would have required Brazilian authorities to submit service requests through U.S. authorities, ensuring oversight and compliance with domestic laws, including constitutional protections. Justice Moraes ignored these safeguards entirely, opting instead for a unilateral approach that imposed his will on a U.S. company without regard for proper legal processes or sovereignty.

65.    Additionally, Justice Moraes disregarded the traditional process of letters rogatory, which offers a formal diplomatic channel for requesting judicial assistance between countries. Letters rogatory are subject to judicial review in the receiving country, ensuring that any request complies with local laws and respects the rights of the targeted entity. This process provides critical safeguards against overreach, as it requires approval from U.S. courts before any foreign order can be enforced. Justice Moraes's decision to sidestep this process highlights his intent to avoid the scrutiny of U.S. courts, knowing that his overbroad and extraterritorial demands would likely be deemed incompatible with U.S. law and public policy.

66.    By bypassing the MLAT, the Hague Service Convention, and the letters rogatory process, Justice Moraes deliberately ignored the established mechanisms of international legal cooperation. These frameworks exist to balance the legitimate interests of sovereign states while safeguarding

against the imposition of foreign legal standards that conflict with domestic laws. Justice Moraes's actions disrupt this balance, unilaterally and unlawfully extending Brazilian judicial authority into the United States without the consent or oversight of U.S. authorities. Such conduct not only disregards the sovereignty of the United States but also sets a dangerous precedent, undermining trust in the legal processes designed to facilitate lawful and respectful international cooperation.

67. Justice Moraes's coercive tactics—including forcing Rumble to appoint Brazilian attorneys under the threat of shutdown and imposing substantial fines—further exacerbate the violation of these mechanisms. His actions reveal a calculated effort to fabricate jurisdiction and enforce Brazilian law extraterritorially, in clear contravention of the principles of comity and mutual respect that underpin international law. Justice Moraes's issuance of the Gag Orders is far outside the scope of his legitimate and lawful authority as a Justice of the STF.

## VI. Justice Moraes's Actions Violate U.S. Public Policy

68. Justice Moraes's Gag Orders represent precisely the type of infringement on free speech rejected by the United States when it denied Brazil's request to extradite Political Dissident A on First Amendment grounds. Through sealed proceedings, punitive fines, and vague allegations of "anti-democratic speech," Justice Moraes is seeking to impose

extraterritorial censorship on U.S.-based companies Rumble and Truth Social. Justice Moraes's extrajudicial tactics are also in direct conflict with U.S. public policy, as articulated in EO 14203, issued by President Trump earlier this month. The EO opposes foreign judicial overreach that seeks to impose jurisdiction on U.S. entities without consent. By coercing Rumble into appointing Brazilian attorneys and threatening punitive actions if it does not comply, Justice Moraes's actions mirror the type of extraterritorial conduct condemned by the EO. His orders also aim to bypass both the prior determination of the U.S. government and the checks and balances that the MLAT and related mechanisms provide, threatening the sovereignty of U.S. law and undermining international cooperation.

69.    The parallels between the ICC's actions condemned in EO 14203 and the conduct of Justice Moraes are striking. Both involve foreign judicial actors purporting to assert extraterritorial jurisdiction over individuals and entities beyond their legitimate reach or without U.S. consent. Just as EO 14203 describes ICC investigations and arrest warrants targeting U.S. citizens as illegitimate and threatening to sovereignty, Justice Moraes's Gag Orders seek to impose Brazilian censorship laws on U.S.-based companies, infringing on constitutionally protected speech and operating outside the permissible bounds of judicial authority.

70.    EO 14203 explicitly highlights the dangers of foreign judicial

actions that impose undue restrictions or penalties on U.S. individuals and entities without due process or jurisdictional authority. Justice Moraes's orders follow the same pattern of overreach: targeting U.S.-based companies like Rumble and TMTG, these orders demand the removal of lawful content—content that does not violate U.S. law. Like the ICC actions described in the EO, Justice Moraes's actions disregard the sovereignty of the United States by bypassing the legal channels that are appropriate to serve and enforce such orders, unilaterally applying foreign legal orders to American entities and activities that are fully compliant with U.S. law.

71.    The EO further emphasizes that foreign judicial overreach is not merely a procedural issue but a substantive threat to the United States. By seeking to impose foreign censorship laws on an American company, Justice Moraes's actions mirror the ICC's attempts to prosecute U.S. citizens for conduct outside the ICC's jurisdiction.

72.    Furthermore, EO 14203 highlights the mechanisms of foreign judicial overreach that align with Justice Moraes's methods. The EO condemns ICC actions that expose individuals to "harassment, abuse, and possible arrest" without legal basis. Similarly, the Gag Orders impose ruinous daily fines and threaten to shut down Rumble if it does not comply with his extraterritorial censorship demands.

73.    The EO targets actions that interfere with lawful conduct under

U.S. law. Justice Moraes's Gag Orders compel the removal of lawful U.S. speech that is fully protected under the First Amendment and shielded by statutory immunities such as the CDA.

74. EO 14203 explicitly rejects the ICC's efforts to claim jurisdiction over non-consenting states or their citizens, emphasizing the principle that sovereignty cannot be undermined by unilateral judicial actions. Similarly, Justice Moraes's actions represent an illegitimate extension of Brazilian judicial power into the United States, targeting U.S.-based companies and their global operations by bypassing lawful channels.

75. EO 14203 warns of the precedent set when international or foreign courts claim authority over nations that have not consented to their jurisdiction. Justice Moraes's actions, if left unchecked, would create a dangerous precedent whereby foreign courts could routinely impose their laws on U.S. companies if they chose to bypass legally established channels, threatening the foundational principles of U.S. sovereignty, free expression, and open discourse.

76. Lastly, EO 14203's provisions imposing tangible consequences on foreign actors who engage in overreach provide a policy framework for rejecting the enforceability of Justice Moraes's Gag Orders. The EO authorizes sanctions, asset freezes, and travel bans against ICC officials responsible for such conduct, signaling that the United States views these

actions are not only illegitimate but actionable.  While this complaint does not seek similar measures, the principles articulated in the EO reinforce the Plaintiffs' argument that Justice Moraes's orders are repugnant to U.S. public policy and must be declared unenforceable within the United States.

77.    In short, Rumble and TMTG stand firm on upholding American free-speech rights over censorship demanded by a foreign judiciary.  Justice Moraes cannot dictate the contours of lawful discourse within the United States.  Only American law—rooted in the First Amendment—should regulate and govern these U.S.-based companies and their American operations.

78.    Plaintiffs respectfully submit that this Court reject the enforceability of Justice Moraes's orders on the grounds that they were issued and attempted to be enforced in violation of established legal mechanisms, in breach of U.S. sovereignty, in violation of U.S. laws, and in a manner incompatible with U.S. public policy.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**U.S. Const. Amend. I; Declaratory Judgment Act (28 U.S.C. § 2201)**

79.    Plaintiffs repeat and incorporate by reference their allegations contained in paragraphs 1–78 of this Complaint.

80.    The  First  Amendment  of  the  U.S.  Constitution  forbids

government abridgement of lawful free expression, including judicial restraints that force U.S.-based online service providers and platforms—such as Rumble and Truth Social—to remove user-generated content that does not violate American law.

81.    The Gag Orders compel the suspension of the Banned Accounts on Rumble, precluding the availability of that content in the United States.

82.    Additionally, the Gag Orders threaten to cease Rumble's operations in Brazil.  Upon information and belief, to enforce this shutdown if Rumble refuses, Justice Moraes will seek to compel third parties, such as telecommunications providers, the Google Play Store, or the Apple App Store, to block access to Rumble's services.

83.    Because Rumble's infrastructure system is globally integrated, a forced shutdown in Brazil would hinder Rumble's ability to fully serve U.S. users as well, disrupting lawful speech.

84.    Because TMTG relies, in part, on Rumble's infrastructure for Truth Social's functionality, any account suspension or forced shutdown of Rumble in Brazil would likely impact Truth Social's full functionality and prevent Truth Social accounts from fully displaying their content to users in the United States.

85.    Judicial restraints aimed at specific speakers or content trigger strict scrutiny.

86.    The Gag Orders are directed to a specific speaker, Political Dissident A, and are content-specific, therefore subject to strict scrutiny.

87.    Enforcing the Gag Orders in the United States would violate the First Amendment.  The Gag Orders further no compelling interest or substantial interest, and they are not narrowly tailored to achieve one. Justice Moraes cannot show that he has no alternatives available other than enjoining the Banned Accounts outside of the United States.

88.    Actions taken to impact service providers like Rumble and platforms like Truth Social or the suspension of the Banned Accounts irreparably harms Rumble and TMTG, as it chills protected speech and erodes user trust.  Such injuries cannot be remedied by monetary damages alone, as lost opportunities for discourse and reputational harm endure even after the shutdowns or the account suspensions.

89.    Plaintiffs are therefore entitled to a declaratory judgment that the Gag Orders are unenforceable in the United States on the ground that enforcement of the orders would violate the First Amendment.

## SECOND CAUSE OF ACTION

### Communications Decency Act, 47 U.S.C. § 230; Declaratory Judgment Act, 28 U.S.C. § 2201

90.    Plaintiffs repeat and incorporate by reference its allegations contained in paragraphs 1–78 of this Complaint.

91.     Under 47 U.S.C. § 230(e)(3), "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  In other words, providers of interactive computer services are immunized for content on their services created by others.

92.     Rumble operates a video-hosting and cloud-based infrastructure through which users post and share their own content, qualifying as an "interactive computer service" provider under Section 230(e)(3).  TMTG provides a social media platform—Truth Social—which hosts user-generated posts and relies, in part, on Rumble's services for functionality.

93.     Justice Moraes has issued orders requiring Rumble—under the threat of daily fines and a potential shut-down—to suspend the Banned Accounts.  This directive directly impacts Truth Social because TMTG's video features and functionality depend, in part, on Rumble's infrastructure.

94.     The Gag Orders do not allege that the targeted content violates U.S. law.   Nor do they claim it involves U.S. intellectual property infringement, U.S. federal criminal acts, or sex trafficking, the statutory exceptions under 47 U.S.C. § 230(e).  The Gag Orders instead rely on broad, foreign "criminal speech" designations that do not align with Section 230's bar on holding companies like Rumble and TMTG liable for user-created content that is lawful in the United States.

95.    Under 47 U.S.C. § 230(e)(3), no state, local, or foreign law may impose liability or enforcement mechanisms that conflict with the CDA's protections.  The Gag Orders compel the suspension of the Banned Accounts and block entire categories of political speech.  Such forced compliance is inconsistent with Section 230's immunity framework and thus preempted by federal law.

96.    Because TMTG's application Truth Social relies, in part, on Rumble's infrastructure, compelled suspension at the Rumble level deprives Truth Social users of full access to lawful speech in the United States.

97.    Rumble and TMTG face either forced unlawful censorship in the United States or incurred fines and forced shutdown.  This conflict imposes irreparable harm on Rumble and TMTG.

98.    Plaintiffs are therefore entitled to a declaratory judgment that the Gag Orders are unenforceable in the United States on the ground that enforcement of the orders would violate the Communications Decency Act.

## THIRD CAUSE OF ACTION

### Enforcement Trespasses on Comity; Declaratory Judgment Act (28 U.S.C. § 2201)

99.    Plaintiffs repeat and incorporate by reference its allegations contained in paragraphs 1–78 of this Complaint.

100.    Foreign courts should not exercise extraterritorial enforcement

jurisdiction over lawful American speech and conduct, as each country is master of its own territory. Foreign injunctions that attempt to control expression on U.S. soil exceed legitimate comity limits.

101. A foreign order is unenforceable if it is "repugnant to the public policy of this state or of the United States."

102. By compelling Rumble, and therefore TMTG, to censor user-generated content that does not violate U.S. law, the Gag Orders conflict with basic First Amendment protections and disregard Section 230's safeguards, rendering them repugnant to U.S. public policy on international comity grounds. And by compelling Rumble to appoint a legal representative in Brazil for the purposes of submitting to Justice Moraes's authority, the Gag Orders attempt to circumvent the US-Brazil MLAT, the Hague Convention on Service, and the letters rogatory process—all in contravention of principles of international comity and sovereignty.

103. Justice Moraes's extraterritorial demands inflict immediate and irreparable harm on Rumble and TMTG by undermining lawful American political discourse, a right central to free speech under U.S. principles, and disregarding Rumble's and TMTG's Section 230 immunities, which are integral to their operational structure and user trust. This damage cannot be remedied by monetary compensation, as lost user confidence and chilled expression cause lasting detriment to Rumble's and TMTG's services and

reputations.

104.  Plaintiffs are therefore entitled to a declaratory judgment that the Gag Orders are unenforceable in the United States on the ground that enforcement of the orders would be repugnant to the public policy of the United States.

**FOURTH CAUSE OF ACTION**

**Declaratory Relief Under Florida's Statutory Foreign Judgment Nonrecognition Policy**

105.  Plaintiffs repeat and incorporate by reference its allegations contained in paragraphs 1–78 of this Complaint.

106.  Florida law incorporates principles analogous to the Uniform Foreign-Country Money Judgments Recognition Act (codified at Fla. Stat. §§ 55.601–55.607).    While these provisions primarily concern "money judgments," Florida courts have recognized the broader public-policy rationale of refusing to enforce or recognize foreign judgments or orders that are repugnant to the public policy of Florida or the United States.

107.  The Gag Orders constitute foreign commands that require extraterritorial censorship on U.S. soil, contradicting core free-speech protections enshrined in the U.S. Constitution; impose daily fines or the threat of total shutdown on U.S.-based businesses (Rumble and TMTG) in a manner contrary to 47 U.S.C. § 230 and Florida's strong policy favoring open

discourse and minimal interference with lawful speech; and are thus "repugnant" to Florida and U.S. public policy under well-established principles of comity and Florida's nonrecognition framework.

108. An actual controversy exists regarding whether these Gag Orders can be recognized or enforced within Florida or anywhere else in the United States. Plaintiffs request a judicial declaration that:

    a. The Gag Orders are unenforceable and nonrecognizable under Florida's nonrecognition statutes and principles of public policy; and

    b. No Florida court or other authority may give legal effect to these or similar foreign orders that require extraterritorial censorship in violation of domestic free-speech protections and statutory immunities.

109. Plaintiffs have no adequate remedy at law to protect their First Amendment and statutory rights, as well as their ongoing business relationships, if these Orders are recognized. Absent declaratory relief, Plaintiffs face imminent and continuing harm to their business, reputation, and users' lawful speech.

110. Plaintiffs respectfully request that the Court declare the Gag Orders unenforceable and nonrecognizable under Florida law and grant such additional relief as the Court deems just and proper, including all forms of

injunctive relief necessary to protect Plaintiffs from further harm or uncertainty.

## **PRAYER FOR RELIEF**

WHEREFORE, Rumble and TMTG pray for judgment against Justice Moraes as follows:

1.     Declare that the Gag Orders are unenforceable in the United States as inconsistent with the First Amendment, the Communications Decency Act, Florida law, and U.S. and Florida public policy;

2.     Issue judgment in Rumble's and TMTG's favor and against Justice Moraes on all causes of action alleged herein;

3.     Grant Rumble and TMTG injunctive relief enjoining enforcement of the Gag Orders in the United States;

4.     Enjoin Justice Moraes from compelling any third party—such as Apple, Google, and any persons or entities acting at their direction—to remove or delist, or threaten to remove or delist, the "Rumble" application or any other applications from their respective app stores in the United States to the extent such action is taken in compliance with, or for the purpose of enforcing, the Gag Orders; and

5.     Grant such other and further relief as the Court may deem to be just and proper.

Dated: February 19, 2025                    Respectfully submitted,



                                    By:    _____

                                           E. Martin De Luca*
                                           BOIES SCHILLER FLEXNER LLP
                                           55 Hudson Yards
                                           New York, NY 10001
                                           (212) 446-2300
                                           mdeluca@bsfllp.com

                                           *Lead Counsel for Plaintiff
                                           Rumble Inc.*

                                           Matthew L. Schwartz*
                                           BOIES SCHILLER FLEXNER LLP
                                           55 Hudson Yards
                                           New York, NY 10001
                                           (212) 446-2300

                                           Andrew H. Smith*
                                           BOIES SCHILLER FLEXNER LLP
                                           1401 New York Ave. NW
                                           Washington, DC 20005
                                           (202) 274 1163

                                           Daria Pustilnik
                                           FLA. BAR NO. 92514
                                           BOIES SCHILLER FLEXNER LLP
                                           100 S.E. 2nd Street, Suite 2800
                                           Miami, Florida 33131
                                           (305) 539-8400

                                           *Counsel for Plaintiff Rumble Inc.*



                                           _____

                                           Caryn G. Schechtman*
                                           DLA Piper LLP (US)

1251 Avenue of the Americas
New York, New York 10020
caryn.schechtman@us.dlapiper.com
(212) 335-4500

*Lead Counsel for Plaintiff*
*Trump Media & Technology Group*
*Corp.*

Christopher G. Oprison
DLA Piper LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
(305) 423-8500

*Counsel for Plaintiff*
*Trump Media & Technology Group*
*Corp.*

*\*Application for pro hac vice*
*admission forthcoming*