# Exhibit A

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| RUMBLE INC. and TRUMP MEDIA & TECHNOLOGY GROUP CORP.<br><br>        Plaintiffs,<br><br>    v.<br><br>ALEXANDRE DE MORAES, Justice of the Supreme Federal Tribunal of the Federative Republic of Brazil<br><br>        Defendant. | **Civil Action No.**<br>**8:25-cv-00411-CEH-AAS** |

## PLAINTIFFS' *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AS TO WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................. 1

II.   STATEMENT OF FACTS ...................................................................... 5

    A.    Rumble and TMTG Promote Free Speech ..................................... 5

    B.    Justice Moraes Leads a Sweeping Campaign to Unlawfully
        Silence Political Dissent ................................................................ 7

    C.    Justice Moraes Reaches into the United States ............................ 14

    D.    Justice Moraes Has Failed to Abide by Established Legal
        Channels to Serve and Enforce Judicial Orders ........................... 23

    E.    The Gag Orders Are Clearly Ultra Vires Acts .............................. 24

    F.    U.S. Law and Public Policy ......................................................... 25

III.  LEGAL STANDARD ............................................................................ 27

IV.   PLAINTIFFS ARE ENTITLED TO A TRO AND PRELIMINARY
    INJUNCTION .................................................................................... 28

    A.    The Balance of Equities and Public Interest Strongly Favor
        Injunctive Relief .......................................................................... 29

    B.    Plaintiffs Are Likely to Succeed on the Merits ............................ 34

        1.    The Gag Orders Infringe Rumble's and TMTG's First
            Amendment Right to Free Speech ....................................... 35

        2.    The Gag Orders Conflict with the CDA ................................. 40

        3.    The Gag Orders Are Unenforceable Under Principles of
            International Comity ............................................................ 43

        4.    There Is No Plausible Defense That Should Preclude
            Injunctive Relief ................................................................. 46

a.    The Court Has Personal Jurisdiction Over Justice Moraes.
.............................................................................. 47

b.    Justice Moraes Is Not Entitled to Immunity .................... 51

C.    No Bond Should Be Required........................................................ 54

V.  CONCLUSION ............................................................................................ 55

# TABLE OF AUTHORITIES

## Cases

*Almeida v. Amazon.com, Inc.*,

    456 F.3d 1316 (11th Cir. 2006) .................................................................... 40

*Ashcroft v. Free Speech Coalition*,

    535 U.S. 234 (2002) ..................................................................................... 39

*Bachchan v. India Abroad Publications Inc.*,

    154 Misc. 2d 228 N.Y.S.2d 661, (N.Y. Sup. Ct. 1992).................................. 45

*BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission*

    *Services*, LLC, 425 F.3d 964 (11th Cir. 2005) .............................................. 54

*Ben Ezra, Weinstein & Co., Inc. v. America Online, Inc.*,

    206 F.3d 980 (10th Cir. 2000) ...................................................................... 36

*Bullfrog Films, Inc. v. Wick*,

    646 F. Supp. 492 (C.D. Cal. 1986) ................................................................ 35

*Cameron v. Scottsdale Insurance Co.*,

    2016 WL 7387388 (S.D. Fla. Dec. 21, 2016).................................................. 34

*Doe v. Harris*,

    772 F.3d 563 (9th Cir. 2014) ........................................................................ 33

*Cox v. McLean*,

    49 F. Supp. 3d 765 (D. Mont. 2014).............................................................. 33

*Democratic Executive Committee of Florida v. Lee*,

    915 F.3d 1312 (11th Cir. 2019) ..................................................... 33

*Farmworker Association of Florida, Inc. v. Moody*,

    734 F. Supp. 3d 1311 (S.D. Fla. 2024) .......................................... 31

*Ferrero v. Associated Materials Inc.*,

    923 F.2d 1441 (11th Cir. 1991) ..................................................... 32

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,

    546 U.S. 418 (2006) ....................................................................... 46

*Google LLC v. Equustek Sols. Inc.*,

    2017 WL 5000834 (N.D. Cal. Nov. 2, 2017) ........................... 40, 42

*Green v. America Online (AOL)*,

    318 F.3d 465 (3d Cir. 2003) .......................................................... 37

*Hendrix v. Poonai*,

    662 F.2d 719 (11th Cir. 1981) ....................................................... 34

*Hilton v. Guyot*,

    159 U.S. 113 (1895) ....................................................................... 43

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,

    515 U.S. 557 (1995) ....................................................................... 37

*In re Estate of Ferdinand Marcos, Human Rights Litigation*,

    25 F.3d 1467 (9th Cir. 1994) ......................................................... 52

*In re Path Network, Inc.*,

    703 F. Supp. 3d 1046 (N.D. Cal. 2023) .................................................... 30, 31

*Klayman v. Zuckerberg*,

    753 F.3d 1354 (D.C. Cir. 2014) ..................................................................... 41

*Knox v. Palestine Liberation Organization*,

    306 F. Supp. 2d 424 (S.D.N.Y. 2004) ........................................................... 53

*Lewis v. Mutond*,

    918 F.3d 142 (D.C. Cir. 2019) ......................................................... 52, 53, 54

*Licciardello v. Lovelady*,

    544 F.3d 1280 (11th Cir. 2008 ............................................................ 48, 49

*Louis Vuitton Malletier, S.A. v. Mosseri*,

    736 F.3d 1339 (11th Cir. 2013) ........................................................... 47, 48

*Marron v. Moros*,

    2023 WL 6356969 (S.D. Fla. Sept. 29, 2023) ............................................... 51

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*,

    312 U.S. 270, ................................................................................................ 34

*MC3 Investments LLC v. Local Brand, Inc.*,

    661 F. Supp. 3d 1145 (N.D. Fla. 2023) ........................................................ 46

*McCarthy v. Johnson*,

    640 F. Supp. 3d 69 (D.D.C. 2022) ................................................................ 45

*Melendres v. Arpaio,*

    695 F.3d 990 (9th Cir. 2012) ........................................................ 33

*Miami Herald Publishing Co. v. Tornillo,*

    418 U.S. 241 (1974) ....................................................................... 37

*Moody v. NetChoice, LLC,*

    603 U.S. 707 (2024) ....................................................................... 37

*Nebraska Press Association v. Stuart,*

    427 U.S. 539 (1976) ....................................................................... 39

*New York Times Co. v. Sullivan,*

    376 U.S. 254 (1964) ....................................................................... 35

*New York Times Co. v. United States,*

    403 U.S. 713 (1971) ....................................................................... 39

*Path Network, Inc.,*

    703 F. Supp. 3d 1046 (N.D. Cal. 2023) ......................................... 31

*Perlman v. Delisfort-Theodule,*

    451 Fed. App'x 846 (11th Cir. 2012) ............................................. 47

*Reed v. Town of Gilbert, Arizona,*

    576 U.S. 155 (2015) ....................................................................... 39

*Republic of Austria v. Altmann,*

    541 U.S. 677 (2004) ....................................................................... 47

*Republic of Panama v. Air Panama Internacional, S.A.*,

 745 F. Supp. 669 (S.D. Fla. 1988) ................................................................. 29

*Republic of Philippines v. Westinghouse Electric Corp.*,

 43 F.3d 65 (3d Cir. 1994) ........................................................................... 45

*Samantar v. Yousuf*,

 560 U.S. 305 (2010) ......................................................................... 47, 51, 52

*Sarl Louis Feraud International v. Viewfinder, Inc.*,

 489 F.3d 474 (2d Cir. 2007) ....................................................................... 44

*Schiavo ex rel. Schindler v. Schiavo*,

 403 F.3d 1223 (11th Cir. 2005) ............................................................. 27, 29

*Sheafen Kuo v. Government of Taiwan*,

 802 Fed. App'x 594 (2d Cir. 2020) ............................................................. 47

*Siegel v. LePore*,

 234 F.3d 1163 (11th Cir. 2000) ................................................................. 30

*Swain v. Junior*,

 958 F.3d 1081 (11th Cir. 2020) ................................................................. 47

*Thompson v. Carnival Corp.*,

 174 F. Supp. 3d 1327 (S.D. Fla. 2016) ....................................................... 51

*United States v. Playboy Entertainment Group, Inc.*,

 529 U.S. 803 (2000) ................................................................................. 40

*United Teachers of Dade v. Stierheim,*

   213 F. Supp. 2d 1368 (S.D. Fla. 2002) ........................................................ 55

*Valle Del Sol Inc. v. Whiting,*

   709 F.3d 808 (9th Cir. 2013) ...................................................................... 30

*Valle del Sol. Inc. v. Whiting,*

   732 F.3d 1006 (9th Cir. 2013) .................................................................... 31

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,*

   169 F. Supp. 2d 1181 (N.D. Cal. 2001) ...................................................... 45

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,*

   433 F.3d 1199 (9th Cir. 2006) .............................................................. 36, 50

*Yousuf v. Samantar,*

   699 F.3d 763 (4th Cir. 2012 ....................................................................... 53

**Statutes**

28 U.S.C. § 2201 ............................................................................................. 34

Communications Decency Act, 47 U.S.C. § 230 ............ 3, 30, 35, 40, 41, 42, 37

Florida Statute § 48.193(1)(a)(2) ............................................................. 47, 48

Stored Communications Act, 18 U.S.C. § 2711(2) ..................................... 30, 41

## Other Authorities

Executive Order 14203 ................................................................. 27, 44

Hague Evidence Convention ............................................................ 45

Hague Service Convention ......................................... 23, 24, 33, 53

Mutual Legal Assistance Treaty ...............................................passim

RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW §§ 404, 408 ............... 44

RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW § 66(f)........................ 52

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 482(2) ........................ 36

## Rules

FED. R. CIV. P. 65(b) ...................................................................... 28

Fed. R. Civ. P. 65(c). ................................................................ 54, 55

Fed. R. Civ. P. 4(k)(2) ................................................................... 51

## Constitutional Provisions

U.S. CONST. Amend. 1 ................................................................... 35

Plaintiffs Rumble Inc. ("Rumble") and Trump Media & Technology Group Corp. ("TMTG," and together with Rumble, the "Plaintiffs") file this motion for an *ex parte* temporary restraining order and preliminary injunction against Alexandre de Moraes ("Justice Moraes"), Justice of the Supreme Federal Tribunal of the Federative Republic of Brazil ("SFT").

## I.    INTRODUCTION

This case presents an extraordinary affront to fundamental principles of free expression, sovereign authority, and the rule of law.  A foreign jurist— Justice Moraes—has not only demanded that Rumble, an American company, censor content in the United States, but has now taken the unprecedented step of personally threatening the CEO of an American company with criminal prosecution for publicly calling Justice Moraes's extraterritorial censorship orders "illegal" and refusing to comply.

Justice Moraes first attempted to force jurisdiction over Rumble by attempting to serve sealed gag orders to Rumble through its prior Brazilian counsel on February 7, 2025.  Former Brazilian counsel rejected service.  Justice Moraes then sent the sealed gag orders in Portuguese, via e-mail, to Rumble's Florida-based legal department.  In response, Rumble and TMTG filed this action this past Wednesday, February 19, 2025, seeking a declaratory judgment that his extraterritorial gag orders are unenforceable in the United States as violative of the First Amendment, U.S. statutory law, and principles

1

of sovereignty and international comity.  That same day, Justice Moraes issued another order—and purported to serve that order on Rumble through the e-mail address of its Florida-based in-house lawyer—demanding that Rumble immediately submit to Justice Moraes's authority or be shut down and incur heavy fines.

The next day, he issued a public order to X (formerly Twitter) for a US $1.4 million fine for not bending to his will in another case in which Justice Moraes sought the data of a Brazilian political dissident in the U.S.[1]  He simultaneously re-sent the orders to Rumble via e-mail to Rumble's in-house counsel.  On Friday evening, Justice Moraes publicly issued an order requiring telecommunications companies to shut down Rumble, imposing a daily fine on Rumble of US $8,700, and threatening personal criminal liability on Rumble's U.S.-based CEO.  Shortly thereafter, we learned that Rumble was no longer accessible in Brazil, and as a result, videos on TMTG's platform were equally inaccessible.

In the face of these coercive and irreparably harmful orders, Rumble and TMTG move for a temporary restraining order to halt the *ultra vires* attempts by Justice Moraes—who has pursued a broad agenda of extraterritorial censorship—to compel Rumble to (1) censor content it has the constitutional

---

[1] Ex. 1.

right to display to U.S. users; (2) divulge confidential account information of U.S. users in direct contravention of U.S. law; (3) suspend financial transactions to a U.S. user regardless of geographic location; (4) appoint a legal representative to submit to the authority of the Brazilian courts, when it otherwise has no operations or business in Brazil; and (5) pay thousands of dollars in escalating daily fines (the "Gag Orders").

Justice Moraes's sweeping directives eviscerate fundamental First Amendment protections by compelling content-based removal of lawful speech on American soil; conflict with Congress's deliberate policy judgments in Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230, which immunizes computer service providers from liability for third-party content; and ignore well-settled principles of sovereignty and international comity, which do not require American courts to enforce foreign orders that contravene U.S. law or public policy.

Absent immediate judicial intervention and injunctive relief, Plaintiffs will suffer further irreparable harm, including the loss of First Amendment freedoms, additional operational challenges, and a permanent erosion of user trust.

This Court's ruling will not only determine whether an American court will allow a foreign judge to dictate speech on U.S. soil—it will also send a clear message to the world about the limits of extraterritorial judicial overreach.

Justice Moraes is not simply attempting to enforce Brazilian law within his own country; he is bypassing well-established legal channels, including the Mutual Legal Assistance Treaty ("MLAT") and other international cooperation mechanisms, which exist precisely to ensure that foreign legal requests comply with U.S. law and constitutional protections. By avoiding these proper procedures, Justice Moraes is deliberately circumventing U.S. government oversight and denying this Court the opportunity to evaluate the legality of his demands. If this type of end-run around U.S. law is allowed to stand, it will embolden other foreign officials to impose their censorship regimes on American companies without due process, suppress political discourse, and interfere with U.S. business operations without legal justification.

By granting this motion, this Court has the opportunity to reaffirm that U.S. law governs U.S. companies operating in the United States—not the unilateral and unchecked orders of a foreign judge who refuses to abide by established judicial cooperation mechanisms. This case is not just about Rumble and TMTG; it is about ensuring that no foreign leader can sidestep U.S. sovereignty and legal protections to coerce an American company into silencing lawful political speech or dismantling constitutionally protected discourse.

## II.    STATEMENT OF FACTS

### A.    Rumble and TMTG Promote Free Speech

Rumble was founded in 2013 as a video-sharing service dedicated to free speech, open discourse, and debate.   Declaration of Stacey Beall ("Rumble Decl.") ¶ 4.  Rumble began its beta cloud hosting services in 2022, with a public launch in 2024.  *Id.*  Rumble allows third-party users to upload videos for online streaming and sharing at Rumble.com.  *Id.*  These videos are available online to users in the United States, one of Rumble's main audiences, and other countries, including Brazil.   *Id.*   Rumble.com features videos in various categories, including "Picks," "Top Live Categories," "Recommended Creators," "Finance," "News," and "Music."

By 2021, Rumble had evolved into a thriving haven for independent content creators—ranging from citizen journalists to educators—who sought an alternative to mainstream tech providers perceived as overzealous in censoring legally protected viewpoints.  *Id.* ¶ 5.  In doing so, Rumble cultivated a robust user community and became widely regarded as a key counterbalance to those bigger service providers whose restrictive policies had begun to erode public trust in the marketplace of ideas.  *Id.*

To ensure open and honest debate, Rumble enforces a content moderation policy and abides by applicable U.S. laws while steadfastly protecting its users' freedom of expression.  *Id.* ¶ 6.  For example, Rumble

removes videos that Rumble determines are inciting violence or unlawful acts, harassing, threatening, or otherwise in violation of Rumble's content moderation policy. *Id.*

Truth Social was launched in 2022 as an online platform expressly rooted in American First Amendment values, with the stated mission of opening up the Internet and giving people their voices back. Declaration of Scott Glabe ("TMTG Decl.") ¶ 4. Truth Social was established as a safe harbor for free expression amid increasingly harsh censorship by other platforms. *Id.* ¶ 4. Truth Social avoids blanket deplatforming or shadow banning of lawful content that complies with its Terms of Service, opting instead for what TMTG believes is a robust, fair, and viewpoint-neutral discretionary moderation system that is consistent with TMTG's objective of maintaining a public, real-time platform where any user can create content, follow other users, and engage in an open and honest global conversation without fear of being censored or cancelled due to their political viewpoints. *Id.* ¶ 5.

TMTG has placed emphasis on building a platform for users to freely express themselves through Truth Social; its brand and business model is built on distinguishing itself from other platforms that have engaged in various forms of censorship, including unjustified bans of user accounts at the behest of government officials. *Id.* ¶ 6.

Neither Rumble nor TMTG has any entities, operations, employees,

bank accounts, or businesses in Brazil.  Rumble Decl. ¶ 7; TMTG Decl. ¶ 7.

In 2021, Rumble and TMTG entered into a Cloud Services Agreement. TMTG Decl. ¶ 8.  Pursuant to this agreement, Rumble has served as Truth Social's primary video-streaming and hosting provider since 2022.  *Id.*  Truth Social relies, in part, on Rumble's technology infrastructure to deliver its services—including videos embedded in Truth Social posts to Truth Social's users.  *Id.* ¶ 9.  As a result, if Rumble were to be shut down in Brazil, Truth Social's ability to deliver its service to Truth Social users would be adversely affected.  *Id.*

## B.    Justice Moraes Leads a Sweeping Campaign to Unlawfully Silence Political Dissent

In 2017, Justice Moraes ascended to the STF following a plane crash that killed his predecessor, Justice Teori Zavascki, on January 19, 2017.  Ex. 2 at 3; Ex. 3.[2]  Justice Zavascki had been presiding over Operation Car Wash ("Lava Jato"), a multi-billion-dollar investigation central to Brazil's anti-corruption drive.  Ex. 3 at 2.  Although Justice Moraes had no prior experience serving as a judge, he was nominated, vetted, and confirmed by the Brazilian Senate in about a month, with his appointment becoming effective on February 22, 2017.

---

[2] All references to exhibits refer to the exhibits attached to the Declaration of Andrew Smith filed in support of Plaintiffs' *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause as to Why a Preliminary Injunction Should Not Issue.

Ex. 4.

In 2019, a major Brazilian newspaper reported that Justice José Antonio Dias Toffoli—a colleague of Justice Moraes on the STF—was implicated in Operation Car Wash and linked to Odebrecht, a conglomerate that admitted to roughly US $788 million in bribes.  Ex. 5 at 1; Ex. 6 at 2.

On March 14, 2019, the STF—via Justice Toffoli—launched Inquiry No. 4781, known as the "Fake News Inquiry," to unilaterally empower itself to open a criminal-style probe *ex officio*, bypassing the Public Prosecutor's Office. Ex. 6 at 5.   Article 43 of the Internal Regulations of the Court (generally reserved for administrative matters) provides that "[i]n case of a violation of criminal law at the premises of the Court, the President will start an investigation, if it involves authority or person subject to its jurisdiction, or delegate this assignment to another Justice."  Ex. 7 at 1.  Justice Toffoli broadly interpreted this to mean the entire internet was considered a physical extension of the Supreme Court.  Ex. 8.  The inquiry targeted perceived insults against the STF: the "dissemination of 'fake news' and the financing scheme related to it, false accusations (*denunciação caluniosa*), threats and other illegal conduct affecting the honor and security of the Supreme Federal Court, its members and their families."  Ex. 7 at 1.  Justice Moraes was appointed to run the inquiry.  Ex. 11 at 4.

Prominent legal scholars, jurists, and observers have criticized the

STF's invocation of Article 43 as violating multiple provisions of the Brazilian Constitution, undermining the accusatory justice system, due process, judicial impartiality, separation of powers, and freedom of expression. *See, e.g.*, Ex. 9 (article by Transparency International warning that the Fake News Inquiry "risks of threatening more freedoms than it curbs crimes" and "threaten[s] journalists who dare to publish reports involving members of the court with censorship and inquisitorial prosecution"); Ex. 10 (blog by Oxford Human Rights Hub explaining how Fake News Inquiry is unconstitutional); Ex. 11 (blog by Human Rights Here blog, Netherlands Network of Human Rights, discussing constitutional issues in Fake News Inquiry).

Brazil's Prosecutor General at the time, Raquel Dodge, formally petitioned the STF to shut down the inquiry as void under the Brazilian Constitution (Ex. 12; Ex. 13), citing the following key constitutional violations:

- **Exclusive Prosecutorial Authority, Article 129 (XIV & I)**. Article 129, I provides that the Public Prosecutor is the sole holder of the power to bring public criminal actions. Ex. 14 at 4; Ex. 15 at 3. By acting unilaterally, the STF violated Article 129's core guarantee of a prosecutor-led criminal process.

- **Separation of Powers, Article 2**. Under Article 2, the roles of the investigator (executive/police), accuser (prosecutors), and judge (courts) must be separate in Brazil's justice system. Ex. 14 at 31; Ex. 16 at 4–5. By giving the STF the power to investigate, prosecute, and judge conduct that offends its members, the STF usurps powers belonging to different branches. Ex. 14 at 20.

- **Judicial Impartiality and Natural Judge, Article 5, XXXVII & LIII)**. These Articles ban "exceptional" courts (Article 5, XXXVII) and

guarantee a "natural" judge (Article 5, LIII). *Id.* at 4, 30–31; Ex. 17 at 5, 7. By having the STF itself open and conduct the investigation, even appointing a specific justice (Justice Moraes), the STF created an ad hoc tribunal outside the normal legal process, with the STF effectively acting as both accuser and judge. *Id.* This structure undermines judicial impartiality and denies the accused to their right to a competent, pre-established judge (chosen by lottery).

- **Due Process, Article 5, LIV & LV**. Article 5, LIV guarantees that no one shall be deprived of liberty without due process of law, and Article 5, LV ensures defendants the rights to a fair hearing, adversarial process, and full defense. Ex. 14 at 11, 18; Ex. 17 at 7. The Fake News Inquiry violates these principles by lacking clear scope, factual basis, and transparency, denying basic procedural fairness. Ex. 14 at 5, 7, 15, 17–18, 23. This is because the inquiry was opened without citing any specific offense or accused person, including any concrete facts to opening the investigation, and because the secretive nature of the inquiry violates the rights of defense. *Id.* at 18, 21. Justice Moraes placed the entire proceeding under seal, even barring access to the Prosecutor's Office and defense lawyers in the early stages. *Id.* at 21.

- **Freedom of Expression & Censorship, Article 5, IV & IX, Article 220**. The Fake News Inquiry's broad scope blurred the line between true threats (which can be punished) and mere criticism or "fake news" (which, however unpleasant, is generally protected speech). Ex. 10. The inquiry's mandate—to investigate offenses "against the honor" of the STF—risked criminalizing speech that should be constitutionally protected. *Id.*

Despite these glaring constitutional issues with the Fake News Inquiry, Justice Moraes denied the Prosecutor General's petition. Ex. 12. He then led the STF's first inquiry, and his first action was to order the removal of the article implicating Justice Toffoli and threatening a daily fine of R$100,000 (about US $20,000) unless it was removed from the internet. Ex. 2 at 3–4. This move was criticized as blatantly unconstitutional. Ex. 11; Ex. 12, Ex. 14.

Under Justice Moraes's stewardship, sealed orders have become routine, compelling U.S.-based online service providers to ban politically outspoken users across their entire platform, including in the United States, based on allegations of "criminal" or "anti-democratic speech," all while threatening hefty daily fines or outright shutdowns.  Ex. 2 at 5.  Because these proceedings are sealed, users often receive no notice or hearing prior to being purged.  Ex. 2 at 5.

For example, in a single 2020 episode, Justice Moraes forced the removal of 16 X (formerly Twitter) accounts and 12 Meta (Facebook) accounts tied to supporters of conservative politics, using "disinformation" claims to justify the purge.  *Id.*

Since 2022, Justice Moraes has reportedly mandated the suspension of nearly 150 accounts, on similar grounds, targeting critics of conservative legislators, journalists, jurists, and even musical performers.  *Id.* at 5–8; Ex. 18 at 1–2.

In October 2022, Elon Musk purchased X, promising more open moderation than under its previous management.  Ex. 19.  This clashed directly with Justice Moraes's demands to remove accounts he labeled "anti-democratic."  Almost immediately after Musk's takeover, Justice Moraes imposed sealed orders demanding the removal of accounts with tight compliance deadlines and thousands in daily fines.  Ex. 2 at 8.  Musk

11

denounced these demands as an abuse of power and infringement on free speech, vowing that X would only remove posts clearly violating U.S. law. Ex. 2 at 4. In response, Justice Moraes threatened X's Brazilian legal representative with arrest and ordered the platform blocked nationwide. Ex. 20. Musk faced a criminal investigation for alleged obstruction of justice after refusing to comply. *Id.* at 3.

In September 2024, in an effort to increase the pressure on X and compel payment of X's fines (which at that point exceeded US $3 million), Justice Moraes ordered the freezing of Starlink bank accounts in Brazil. *Id.* at 4. X responded: "Regardless of the illegal treatment of Starlink in freezing our assets, we are complying with the order to block access to X in Brazil. We continue to pursue all legal avenues, as are others who agree that @alexandre's [*i.e.*, Justice Moraes's] recent order violates the Brazilian constitution." Ex. 21. X eventually yielded, paying around US $5 million in fines so Brazilians could regain access to the platform.

Justice Moraes also pursued other high-profile targets, including a conservative commentator who openly questioned the breadth of "anti-democratic" speech rules and criticized Justice Moraes's reliance on sealed directives. Ex. 2 at 6. In response, Justice Moraes issued sealed instructions to block all of his networks within two hours—on penalty of severe fines—erasing him from an audience of millions. Ex. 2 at 5. At the same time, Justice

Moraes froze his assets (despite the fact he was a U.S. legal permanent resident) and voided his passport, demonstrating a systematic effort to punish and deter lawful expression.  Ex. 2 at 73–77.

On April 17, 2024, a U.S. House Judiciary Committee and Select Subcommittee documented Justice Moraes's escalating conduct.  Ex. 2.  The report issued by the Subcommittee identified 51 separate takedown orders that Justice Moraes issued to X.  *Id.* at 9–12.  It highlighted how sealed directives and the threat of punitive fines—often tens of thousands of dollars per day—systematically forced online video sharing platforms and service providers to expunge accounts and silence law-abiding voices.  *Id.* at 4.  The House report noted that Justice Moraes specifically sought to ban high-profile critics across multiple networks, illustrating the breadth of the campaign and the harsh penalties faced by anyone whom Justice Moraes deems "anti-democratic."  *Id.*

On their face, Justice Moraes's directives purport to safeguard electoral integrity or protect democracy, yet in practice they target independent voices, erase public debates, and wield daily fines or asset freezes to coerce compliance.  Such sealed proceedings and secret blacklists go far beyond mere content moderation, forming a deliberate, punitive campaign to eradicate legitimate dissent and solidify Justice Moraes's dominance over public discourse not only in Brazil, but in the United States as well.

### C.    Justice Moraes Reaches into the United States

If Justice Moraes's actions were confined to Brazil, they would be regrettable, but likely not in the province of U.S. courts.  Many of Justice Moraes's actions, including the illegal Gag Orders challenged here, however, reach directly into the United States to compel action by U.S. companies having no presence in Brazil, and which will have the effect of suppressing speech not just in Brazil, but in the United States and throughout the world.

Political Dissident A has been a favorite target of Justice Moraes.  He is a U.S.-based conservative Brazilian commentator and blogger, known for founding media outlets critical of the STF. Ex. 2 at 192–93.  Political Dissident A built a sizable online following by advocating for free-speech principles and voicing strong support for conservative politicians.  *Id*.  This included a YouTube channel with over 1.3 million followers.  *Id.*

Over time, Political Dissident A's reporting and commentary clashed with Justice Moraes's views, which he criticized as overreaching and politically biased. Ex. 2 at 192–93, 209–10.  As a result, Justice Moraes began attacking Political Dissident A through censorship orders and criminal investigations into his allegedly "anti-democratic" speech.  Exs. 22–25.  In 2021, Political Dissident A left Brazil after Justice Moraes issued a warrant for his arrest for the crime of "spreading misinformation" and "criticizing the Supreme Court," activities that are, of course, First Amendment-protected speech in the United

14

States.  Ex. 29 at 7.  Political Dissident A sought political asylum in the United

States, where he remains.  *Id.*

Justice Moraes then sought the extradition of Political Dissident A from

the U.S.  In March 2024, the United States informed Brazil that it would not

extradite Political Dissident A for "crimes of opinion," which are guaranteed by

the right to freedom of expression under the First Amendment.  Ex. 30.  Justice

Moraes had failed to provide valid grounds for extradition.  *Id.*  The United

States requested more information about the "crimes," but the SFT failed to

provide "any new information."  *Id.*  When U.S. authorities went to Brazil to

meet with the Ministry of Justice to discuss the issue, representatives from

Brazil aired a video of Political Dissident A's purported "coup" speeches, which

U.S. representatives responded were "just words."  *Id.*

In yet another indication that Justice Moraes's actions lack legal

legitimacy, recent reports confirm that INTERPOL has removed all records

related to Political Dissident A from its databases, effectively nullifying any

international enforcement mechanisms that Brazil may have sought against

him for his crimes of opinion.  This removal reinforces what the U.S.

government has already determined—namely, that the charges against

Political Dissident A are based on political speech rather than legitimate

criminal conduct.  Despite this, Justice Moraes continues to pursue unlawful

censorship orders against U.S.-based companies, attempting to silence

15

Political Dissident A through extrajudicial means rather than lawful
international cooperation channels.  His persistence in targeting Political
Dissident A, even after the U.S. denied extradition and Interpol erased his
records, further underscores that this is not about law enforcement but rather
a politically motivated effort to extend Brazilian censorship into the United
States.  Ex. 36.

On February 9, 2025, Justice Moraes purported to "serve," via e-mail, an
order to Rumble at legal@rumble.com, the e-mail address for Rumble's legal
department, which is located in Florida.  Ex. 22; Rumble Decl. ¶ 9.  The Gag
Order requires Rumble's "IMMEDIATE compliance" with the following: (1)
"within two hours, block[] the channel/profile/account[s]" identified in the Gag
Order as belonging to Political Dissident A (two accounts); (2) "not . . . authorize
the creation of a new channel/profile/account[s]" for Political Dissident A
(permanent block from Rumble); (3) "provide the corresponding account
information to this SUPREME COURT with the full preservation of the
content"; (4) "immediately suspend the transfer of amounts arising from
monetization, services used for donations, payment of advertisements and
registration of supporters, including those carried out through the provision of
transmission keys to the aforementioned channels/profiles"; and (5) "inform[]
this SUPREME COURT of all transfers made up to the date of receipt of the
court order."  Ex. 22 at 4–5.  Justice Moraes threatened a "daily fine of R$

16

50,000.00" (about US $9,000) for noncompliance.  *Id.* at 5.

The February 9 Gag Order does not impose any geographic limitations on censorship.  Ex. 22.  It also fails to provide *any* basis to justify its sweeping demands—stating only "that a decision has been rendered" in a "confidential proceeding."  *Id.*

On February 10, 2025, Justice Moraes directed the bailiff to "serve" a new Gag Order—addressed to Rumble Inc.—to another Rumble entity, Rumble Canada Inc.  Ex. 23.  The next day, two near identical orders were e-mailed to André Giacchetta, a Brazilian attorney, who does not serve as a legal representative of Rumble.  Exs. 23–24.  He responded the following day, on February 11, 2025, correctly informing the bailiff that his firm did not have powers to receive any orders or to be served on behalf of Rumble.  Ex. 31.

The February 10 Gag Orders demanded that the "legal representative of the company Rumble Inc." prove, within 48 hours: (1) "compliance with Brazilian legislation and the judicial decision" [the Gag Order]; (2) "the regularity and validity of the legal representation of RUMBLE INC. in Brazil, with documentary proof of the respective Commercial Registry of the regular constitution of the company"; and (3) evidence of an appointed Rumble representative in Brazil "with broad powers, including the appointment of lawyers"—all "under penalty of suspension of the activities of the said company in Brazilian territory."  Exs. 23–24.

17

Like the February 9 order, the February 10 Gag Orders did not impose any geographic limitations to Brazil or much less provide an adequate basis justifying Justice Moraes's sweeping demands.  Ex. 23 at 5–6; Ex. 24 at 5–6.  Justice Moraes vaguely claimed that Political Dissident A used "social networks" as "protective shields for the practice of illegal activities, giving the investigated a true clause of criminal indemnity for the maintenance of the commission of crimes already indicated," with Political Dissident A "showing no restriction in propagating his criminal speeches."  *Id.*  He also claimed Political Dissident A used Rumble for the "dissemination of illegal content."  Ex. 23 at 7; Ex. 24 at 7.  Justice Moraes did not identify any speech, much less any problematic or legally prohibitable speech, in his order.  Exs. 23–24.

Rumble and TMTG filed this action on February 19, 2025.  The next day, Justice Moraes e-mailed Rumble another Gag Order in Portuguese—now to the e-mail address of Rumble's interim General Counsel based in Florida.  Ex. 25; Rumble Decl. ¶ 2.  The February 20 Gag Order is thirteen pages attempting to justify Justice Moraes's judicial overreach.  Ex. 25.  The order recites Brazilian law but utterly fails to provide any factual basis for its demands.  *Id.*  The February 20 Gag Order threatens the "immediate" suspension of Rumble's activities in Brazilian territory (*id.*), an act which would affect Rumble's infrastructure operating in Florida.  He resent the same order again the following day, on February 20, 2025, to the e-mail address of

18

Rumble's counsel located in Florida (Ex. 25), while also issuing a new directive

publicly imposing a US $1.4 million fine on X for not producing information.

Ex. 1.

To be clear, the Gag Orders[3] do not limit their scope to Brazilian

audiences.  They impose a complete ban on Political Dissident A's content,

regardless of geographic reach or the lawful nature of the commentary under

American free-speech standards.  They ban, for example, a video from Political

Dissident A on Rumble.com discussing his attendance at the Conservative

Political Action Conference ("CPAC") in Washington, D.C., including his

enjoyment of the booths promoting Christian values.  Ex. 27 at 1, 3.  Political

Dissident A explains he shares this information to encourage similar

initiatives in Brazil.  *Id.* at 4.  In another video, he discusses the importance of

education.  Ex. 28 at 4.

Even though the Gag Orders do not identify any unlawful speech, they

nonetheless require that Rumble—from its Florida-based headquarters and

without any Brazil operations—to close Political Dissident A's accounts, and

in doing so impose a complete ban on his content, regardless of geographic

reach or the lawful nature of the commentary under American free-speech

---

[3] In this motion, the "Gag Orders" include the February 9, February 10, February 20, and
February 21 orders issued by Justice Moraes to Rumble.

standards. Exs. 22–25. The Gag Orders demand that Rumble enforce a universal ban on the targeted accounts, imposing a total blackout that extends even to U.S. users. *Id*. This is not merely a takedown of specific content, but an across-the-board prohibition on any speech by Political Dissident A, backed by escalating daily fines and the forced shutdown of Rumble's online video sharing services and cloud hosting services. *Id*. The risk of a Rumble shutdown beyond Brazil's borders is heightened by Justice Moraes's known practice of ordering tech giants (like Google and Apple) to take actions to enforce his orders, such as removing noncompliant apps from their stores on pain of similar punishing penalties. Ex. 2 at 446.

The Gag Orders also require Rumble, a U.S.-based company with no presence or operations in Brazil, to appoint local attorneys solely for the purpose of accepting service of Justice Moraes's censorship mandates (and the corresponding penalties), and to otherwise fall under the authority of Justice Moraes. Ex. 23 at 7; Ex. 24 at 7; Ex. 25 at 19.

In the late afternoon of February 21, 2025, Justice Moraes issued a public order mandating the suspension of Rumble in Brazil and imposing daily fines (previously set at R$50,000, about US $8,700). Ex. 26 at 31. Rumble received that order via e-mail to Rumble's in-house counsel in Florida. *Id*. The supposed basis for that order was that Rumble did not comply with Justice Moraes's orders that Rumble suspend Political Dissident A's accounts and

submit itself to the jurisdiction of the court in Brazil—even though Justice
Moraes has expressly recognized that Rumble cannot be served with legal
process in Brazil.  *Id.* at 2, 10, 26.  Justice Moraes accuses Rumble of "the
maintenance and expansion of the instrumentalization of RUMBLE INC.,
through the performance of extremist groups and digital militias on social
networks," including the dissemination of "racist, hateful, and anti-democratic
speeches."  *Id.* at 31.  The order does not identify what "racist, hateful, anti-
democratic speeches" it refers to or where on Rumble.com they exist.[4]

The order goes another step too far and personally threatens Rumble's
CEO with criminal liability for allegedly "encourag[ing] the posting of
extremist, hateful, antidemocratic speech."  *Id.* at 26.  The purported "criminal"
speech is an X post from Rumble's CEO on February 19, stating that Justice
Moraes's Gag Orders are "illegal" and unenforceable and will therefore be
challenged in court.  *Id.* at

Justice Moraes then ordered the President of the National
Telecommunications      Agency      ("ANATEL"),      Brazil's      national
telecommunications agency, to "IMMEDIATELY adopt all the necessary
measures for the effectiveness of the measure"—the "complete" suspension of

---

[4] Additionally, Rumble removes videos or messages that Rumble determines are inciting
violence or unlawful acts, harassing, threatening, or otherwise in violation of Rumble's
content moderation policy.  *See* Rumble Decl. ¶ 6.

Rumble in Brazil. *Id.* at 32. The order does not identify what measures
ANATEL must implement and how it will affect Rumble's technology
infrastructure in Florida. The order also imposes daily fines. *Id.*

Justice Moraes's extraterritorial censorship exerts a direct, tangible
impact on both Rumble and TMTG. Rumble Decl. ¶¶ 10–11, 14–16, 20; TMTG
Decl. ¶ 9–11, 13, 16. Rumble—with its headquarters, key physical servers, and
technical infrastructure located on American soil—is subject to substantial
fines and an outright ban for refusing to comply with an extraterritorial Gag
Orders. *Id.* ¶¶ 4, 7–9. The stakes are magnified by the possibility that Justice
Moraes will likely pressure Google and Apple to remove the Rumble app from
their app stores entirely, effectively banning it from U.S. devices, and coerce
other third-party telecom providers to shut down Rumble. *Id.* ¶ 15–16; Ex. 35.

Truth Social—which depends, in part, on Rumble's technology and
infrastructure—is likewise at risk of operational challenges in the United
States. TMTG Decl. ¶ 11. Because TMTG relies on Rumble's back-end
services—including cloud hosting, user logins, and video streaming—for Truth
Social, Justice Moraes's extraterritorial demands threaten to erase lawful
American speech and disrupt Truth Social's core functionality within the
United States. *Id.* ¶ 11. Should Rumble be forced into compliance—or face
broad, unspecified expulsion from the Brazilian market and elsewhere
pursuant to orders from Justice Moraes—Truth Social would endure

challenges to its ability to publish and share content.

### D. Justice Moraes Has Failed to Abide by Established Legal Channels to Serve and Enforce Judicial Orders

Justice Moraes's attempts to enforce his orders in the United States by e-mail to Rumble, or by forcing Rumble to designate attorneys in Brazil are plainly improper.

The United States and Brazil are parties to an MLAT in criminal matters, which entered into force on February 21, 2001.  Ex. 32.  The MLAT establishes clear procedures for the exchange of information, service of documents, and enforcement of orders in criminal investigations involving cross-border issues.  Among the tools available under the MLAT are provisions for serving documents (Article 13), obtaining testimony or evidence (Article 8), and conducting searches and seizures (Article 14), all of which must be channeled through the designated Central Authorities: the U.S. Department of Justice and Brazil's Ministry of Justice.  Ex. 32 at 13, 16–17.

In addition to the MLAT, the Hague Service Convention (to which both the United States and Brazil are signatories) and the traditional process of letters rogatory exist to provide a mechanism to lawfully serve foreign legal process in the United States.  Ex. 33.  These mechanisms are well-established and recognized by both countries, and adhere to the principles of sovereign consent.  The Hague Service Convention provides a streamlined framework for

cross-border service of judicial documents.  *Id.*  Letters Rogatory involve formal requests through diplomatic channels for judicial assistance, subject to the approval of the courts in the country where assistance is sought.  *Id.*

These mechanisms are grounded in mutual respect for sovereignty and ensure that legal orders originating in one country are processed in a manner consistent with the laws and constitutional protections of the other.  They preserve the integrity of international cooperation while respecting each country's sovereignty and preventing overreach by foreign judicial actors.

### E.    The Gag Orders Are Clearly Ultra Vires Acts

Justice Moraes knowingly and intentionally circumvented each of these mechanisms in issuing the Gag Orders.  Justice Moraes's *ultra vires* actions to bypass the MLAT, the Hague Service Convention, and the traditional letters rogatory process were not accidental or inadvertent but deliberate and calculated maneuvers to circumvent well-established mechanisms designed to ensure due process and consent of the U.S. government and U.S. courts. Justice Moraes has used these legal mechanisms in the past dozens of times and is aware of their import.  These mechanisms provide well-established frameworks for addressing cross-border legal matters, ensuring that requests from foreign judicial authorities are reviewed for compliance with the laws and constitutional protections of the receiving nation.  Justice Moraes's circumvention of these legal frameworks reveals his intention to have the Gag

24

Orders effectuated without scrutiny under any lawful process.

These frameworks exist to balance the legitimate interests of sovereign states while safeguarding against the imposition of foreign legal standards that conflict with domestic laws. Justice Moraes's actions disrupt this balance, unilaterally and unlawfully, extending Brazilian judicial authority into the United States without the consent or oversight of U.S. authorities. Ex. 7; Ex. 9; Exs. 11–14. Such conduct not only disregards the sovereignty of the United States but also sets a dangerous precedent, undermining trust in the legal processes designed to facilitate lawful and respectful international cooperation.

### F.    U.S. Law and Public Policy

The United States has long upheld free speech as a cornerstone of its constitutional framework, enshrined in the First Amendment, and has consistently opposed censorship, particularly when imposed extraterritorially by foreign governments. Vice President JD Vance's speech at the Munich Security Conference on February 14, 2025, reaffirmed these principles as a critical component of U.S. public policy. Ex. 34. Speaking before a global audience, Vice President Vance articulated the U.S. commitment to defending free expression against judicial overreach and authoritarian measures cloaked under the guise of combating "misinformation" or "anti-democratic speech." *Id.* at 3–4.

Vice President Vance explicitly condemned judicial censorship, stating, "You cannot win a democratic mandate by censoring your opponents or putting them in jail." *Id.* at 5. He emphasized the incompatibility of true democratic governance with practices that suppress dissent, restrict lawful expression, or penalize opposition viewpoints. *Id.* at 2–4. He warned that such measures undermine not only domestic freedoms but also global confidence in democratic institutions. These statements underscore a U.S. policy framework that categorically rejects the enforcement of foreign censorship orders, such as those issued by Justice Moraes, on U.S.-based service providers like Rumble and online platforms like Truth Social.

The Vice President, in outlining U.S. policy, further noted that free speech is essential to a functioning democracy, even when it involves controversial or unpopular viewpoints. *Id.* at 4–5. He highlighted the dangers of delegitimizing lawful discourse through overbroad censorship mechanisms, warning that such actions erode the very principles they purport to protect. By asserting that "democracy rests on the sacred principle that the voice of the people matters," Vice President Vance underscored the need to resist extraterritorial dictates that seek to silence lawful speech within the United States.

The United States' longstanding opposition to foreign judicial overreach

is further reinforced by Executive Order 14203, issued on February 6, 2025.[5] This order underscores the U.S. government's unequivocal commitment to protecting its citizens, entities, and allies from illegitimate foreign judicial actions. Specifically targeting the International Criminal Court ("ICC"), EO 14203 denounces attempts by the ICC to assert jurisdiction over U.S. or allied persons without U.S. consent, describing such actions as a direct affront to U.S. sovereignty and national security. EO 14203 establishes a U.S. policy framework that rejects foreign judicial attempts to impose their legal standards extraterritorially—standards that conflict with U.S. constitutional protections and established legal norms.

## III.  LEGAL STANDARD

"[T]he four factors to be considered in determining whether temporary restraining or preliminary injunctive relief is to be granted" are: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005).

---

[5] Exec. Order No. 14203, 90 Fed. Reg. 9369 (Feb. 6, 2025), *reprinted in* 3 C.F.R. __ (2025).

Pursuant to Fed. R. Civ. P. 65(b), a court may issue a temporary restraining order *ex parte* if "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and "(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED. R. CIV. P. 65(b)(1).

## IV. PLAINTIFFS ARE ENTITLED TO A TRO AND PRELIMINARY INJUNCTION

Justice Moraes's Gag Orders threaten imminent and irreparable harm to both Rumble and TMTG. Absent preliminary relief, Rumble must either to comply with the unlawful, extraterritorial, and *ultra vires* Gag Orders—and in doing so censor Political Dissident A's content throughout the world, provide confidential information to Justice Moraes that cannot possibly be clawed back, subject an appointed legal representative in Brazil to Justice Moraes's unlawful exercise of authority, pay escalating daily penalties—or be shut down. Either path will irreparably harm Rumble, and by extension TMTG.

While there is a substantial risk of irreparable harm to Rumble and TMTG in enforcing the Gag Orders, there is no harm to Justice Moraes from staying his Gag Orders pending a proper hearing on the merits of Plaintiffs' claims. Additionally, the public interest—which in this context means the American public interest, *see, e.g., Republic of Panama v. Air Panama*

28

*Internacional, S.A.*, 745 F. Supp. 669, 675 (S.D. Fla. 1988) (considering whether a preliminary injunction would serve the public interest of the United States despite the case being brought by a foreign state in a U.S. court)—would be served by the requested relief. *See generally Schiavo ex rel. Schindler*, 403 F.3d at 1225–26.

As established below, Plaintiffs have a substantial likelihood of success on the merits given the patent, unlawful extraterritorial nature of Justice Moraes's Gag Orders. The Court should therefore grant a temporary restraining order and preliminary injunction.

### A.    The Balance of Equities and Public Interest Strongly Favor Injunctive Relief

The three factors balancing the equities and public interest strongly favor injunctive relief. Plaintiffs establish they will suffer irreparable harm absent injunctive relief, that the threatened injury to Plaintiffs outweighs any harm the relief would inflict on Justice Moraes, and that the entry of the relief would serve the public interest.

*First*, Rumble and TMTG will suffer irreparable harm if Rumble is forced to comply with the Gag Orders. Enforcement of the Gag Orders in the United States forces Rumble into a legal Catch-22: comply with the orders and submit the jurisdiction of a foreign court in which Rumble has no operations, forego First Amendment freedoms, and forego statutory protections under the CDA,

or defy them and face, at a minimum, tens of thousands of dollars in penalties abroad, which could eventually be enforced through a judgment against Rumble, and the shutdown and dismantling Rumble's global business, and disruption of TMTG's business.  Rumble Decl. ¶¶ 14–20; TMTG Decl. ¶¶ 9–17. Courts regard such harm as tipping the equities in favor of an injunction, as the "loss of First Amendment freedoms, for even minimal amounts of time, unquestionably constitutes irreparable injury."  *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013); *see generally Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc) ("an imminent likelihood that pure speech will be chilled or prevented altogether" is "presumed to cause irreparable injury").

Beyond the First Amendment injury, Rumble will be irreparably harmed by the enforcement of the Gag Orders in other ways, as well.  Rumble will be forced to disclose user account and transaction information (Ex. 22 at 4–5)— information which cannot possibly be clawed back from Justice Moraes once produced—which, among other things, will force Rumble to violate U.S. data privacy laws like the Stored Communications Act ("SCA"), 18 U.S.C. § 2711(2).

The SCA prohibits a provider of "remote computing service[s]" ("RCS") from "knowingly divulg[ing] a record or other information pertaining to a subscriber" except pursuant to an enumerated exception.  *Id.* §§ 2702(a)(3), (c). "[E]xceptions to the SCA are to be construed narrowly." *In re Path Network, Inc.*, 703 F. Supp. 3d 1046, 1073 (N.D. Cal. 2023).  An RCS "means the

provision to the public of computer storage or processing services by means of an electronic communications system." *Id.* § 2711(2).

Rumble qualifies as a provider of RCS because it provides cloud-based storage for user-generated content, including videos and related data (such as transaction records). Rumble Decl. ¶ 4. Rumble therefore cannot voluntarily disclose Political Dissident A's account "record or other information" pertaining to him pursuant to the Gag Orders,[6] or it will otherwise face liability. Such liability constitutes irreparable harm. *See Valle del Sol. Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (finding that organizational plaintiffs will suffer irreparable harm when they show "ongoing harms to their organizational missions as a result of [a] statute"); *see also Farmworker Association of Florida, Inc. v. Moody*, 734 F. Supp. 3d 1311, 1338 (S.D. Fla. 2024) (finding that the threat of prosecution constitutes irreparable harm); *id.* (explaining that forcing one to choose "between engaging in conduct she views

---

[6] No exception applies here. The Gag Orders were not issued by a qualifying "government entity," 18 U.S.C. § 2702(c)(1), (4), because they are from a foreign judge, not a "department or agency of the United States or any State or political subdivision thereof," *id.* § 2711(c)(4). *See also* 18 U.S.C. § 2703(a)(c) (same analysis). They also were not issued pursuant to any lawful processes for international service of an order, such as the MLAT. *Id.* § 2711(c)(7); Rumble Decl. ¶¶ 11–12. Additionally, it would be Justice Moraes's burden to establish consent under 28 U.S.C. § 2711(c)(2). *See In re Path Network, Inc.*, 703 F. Supp. 3d 1046, 1073 (N.D. Cal. 2023) ("The party seeking the benefit of the exception has the burden to prove consent."). The remaining exceptions are inapplicable here, as Rumble does not seek to invoke them. *Id.* § 2711(c)(3), (5), (6).

as unconstitutionally proscribed—and facing a credible threat of prosecution [as a result]—and refraining from conduct she believes to be lawful . . . is sufficient to establish irreparable harm").

Plaintiffs also face the impairment of their businesses, with the attendant loss of goodwill and consumer confidence. *See, e.g.*, *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (finding that a company's loss of goodwill and "long-time customers" is an "irreparable injury").

Rumble would also be forced to designate a legal representative in Brazil, at its own cost, thereby submitting to Justice Moraes's future jurisdiction and authority, in a way that also cannot be undone and that would expose Rumble to the continued threat of his arbitrary exercise of power. No monetary award can undo this harm. *See Ferrero*, 923 F.2d at 1449 ("An injury is irreparable [when] it cannot be undone through monetary remedies." (cleaned up)).

*Second*, the balance of hardships tilts overwhelmingly toward Rumble and TMTG. Enforcement of the Gag Orders will coerce Rumble into losing fundamental rights, violating federal privacy laws, enduring high monetary penalties, damaging its reputation, and potentially being shut down entirely, and will be detrimental to TMTG's business. Justice Moraes, on the other hand, has nothing to lose. Justice Moraes can still utilize the U.S.-Brazil MLAT, Hague Convention, or letters rogatory procedures to serve orders in the

United States, which would then be subject to a process inherently designed to be fair and lending itself to discerning scrutiny by U.S. authorities to avoid the precise judicial overreach exhibited by Justice Moraes.  The only possible "harm" to Justice Moraes from a delay in implementing his Gag Orders is continued speech by Political Dissident A.  But lawful speech, even if critical of Justice Moraes, cannot constitute a valid injury for purposes of this analysis. *See, e.g.*, *Cox v. McLean*, 49 F. Supp. 3d 765, 773 (D. Mont. 2014) (finding that the balancing of hardships will not tip in a defendant's favor when he fails to identify the existence of any real hardship, particularly when plaintiff has shown that his First Amendment rights will be infringed absent an injunction).

*Third*, enjoining the Gag Orders will serve the public interest, as protecting core constitutional rights, respecting U.S. law, and honoring state sovereignty and international comity is always in the public's favor.  *See Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) ("[T]he public interest is served when constitutional rights are protected." (citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is always in the public interest to prevent the violation of a party's constitutional rights." (cleaned up)))).  Censoring constitutionally protected speech, on the other hand, is repugnant to U.S. policy and not possibly in the public interest. *Cf. Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("[Courts]

have consistently recognized the significant public interest in upholding First Amendment principles.").

### B.     Plaintiffs Are Likely to Succeed on the Merits

Rumble and TMTG are likely to succeed in their claim for a declaratory judgment that the Gag Orders are unenforceable in the United States.

Under the Declaratory Judgment Act, "federal courts have the authority to declare the rights and other legal relations of any interested party in a case of actual controversy, regardless of whether further relief is or could be sought." *Cameron v. Scottsdale Insurance Co.*, No. 1:16-CV-21704, 2016 WL 7387388, at *2 (S.D. Fla. Dec. 21, 2016) (citing 28 U.S.C. § 2201). "The Declaratory Judgment Act is liberally construed to accomplish its purpose of providing a speedy and inexpensive method of adjudicating legal disputes." *Id.* (cleaned up).

Plaintiffs are likely to succeed on their declaratory judgment claims because extraterritorial application of the Gag Orders runs afoul of the First Amendment, the CDA, and principles of international comity.  *See Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (actual controversy sufficient to justify declaratory judgment exists if "the facts alleged . . . show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (citation omitted)); *see also Hendrix v. Poonai*, 662 F.2d

34

719, 721 (11th Cir. 1981) (a justiciable controversy under the Declaratory Judgment Act exists if the alleged facts show "that there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").

> 1. <u>The Gag Orders Infringe Rumble's and TMTG's First Amendment Right to Free Speech</u>

The First Amendment provides that Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. CONST. Amend. 1. This prohibition extends to judicial restraints on free speech. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) ("Although this is a civil lawsuit between private parties, the Alabama courts have . . . impose[d] invalid restrictions on their constitutional freedoms of speech and press."). And it is of no moment that Justice Moraes is a Brazilian, rather than American, judge. By attempting to enforce the Gag Orders extraterritorially in the United States, the Gag Orders become subject to First Amendment scrutiny. *See, e.g.*, *Bullfrog Films, Inc. v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986) ("[T]here can be no question that, in the absence of some overriding governmental interest such as national security, the First Amendment protects communications with foreign audiences to the same extent as communications within our borders. Thus, the regulations at issue here must undergo the same constitutional analysis as would be applied to any legislation claimed to

infringe on First Amendment freedoms at home."); *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1217 (9th Cir. 2006) (en banc) ("[I]f the French court were to require additional compliance with respect to users in France, and that additional compliance would have the necessary consequence of restricting access by users in the United States, Yahoo! would have both a domestic and an extraterritorial First Amendment argument.").[7]

Those Gag Orders, which purport to require Rumble to shut down Political Dissident A's accounts and impose penalties for noncompliance infringe Plaintiffs' First Amendment rights.

*First*, Rumble's and TMTG's speech is "protected" speech because they are private platforms and service providers engaged in expressive activity.[8]

---

[7] *See also, e.g.*, RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 482(2) ("A court in the United States need not recognize a judgment of the court of a foreign state if . . . the cause of action on which the judgment was based, or the judgment itself, is repugnant to the public policy of the United States.").

[8] Having editorial control as a platform does not remove Section 230 protection under the CDA. To the contrary, Section 230 was designed to encourage content moderation by platforms and other service providers by ensuring that taking down offensive material would not expose them to civil liability. *See, e.g.*, *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003) ("By its terms, § 230 provides immunity to AOL as a publisher or speaker of information originating from another information content provider. The provision precludes courts from entertaining claims that would place a computer service provider in a publisher's role, and therefore bars lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone, or alter content."); *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) ("§ 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions."); *Ben Ezra, Weinstein & Co., Inc. v. America Online, Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) ("Congress clearly enacted § 230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions"). Section 230 therefore reinforces an interactive computer service provider's First Amendment right of editorial discretion.

"[P]resenting a curated and edited compilation of [third party] speech is itself protected speech." *See Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024) (cleaned up). The operation of Plaintiffs' services—from the overall business ethos to decisions about design and moderating user content—is protected speech.

Rumble is a video-sharing service dedicated to free speech and open discourse. Rumble Decl. ¶ 4. To engage users, Rumble.com features videos in various categories, including "News" and "Picks." *Id.* Rumble Decl. ¶ 4. To ensure open and honest debate, it also enforces certain content moderation policies and can remove material that violates its rules, such as videos that incite violence. *Id.* ¶ 6; *see Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 570 (1995) (recognizing a hosting company's right to select speech it disseminates); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (recognizing a newspaper's "editorial control and judgment" in publishing information as a core First Amendment activity). By prohibiting Rumble from carrying all content from a popular political commentator—and by extension disabling TMTG's ability to integrate that content—the Gag Orders place a direct restraint on the content moderation abilities of both American companies.

TMTG, which owns and operates Truth Social, an online platform that curates user posts, similarly sets community guidelines, and decides which

accounts or content to block or highlight.  TMTG Decl. ¶ 14.  These decisions are a form of editorial judgment, which is at the heart of the First Amendment's protection of free expression.  *Moody,* 603 U.S. at 744 ("[T]he editorial judgments influencing the content of those [Facebook's] feeds are . . . protected expressive activity.").

Crucially, no U.S. court has adjudicated Political Dissident A's content to be unlawful.  The Gag Orders claim Political Dissident A's account is being used for "criminal" speech, imposing a prior restraint on all of Political Dissident A's content—without even identifying the supposedly "criminal" speech in his Rumble accounts.  Exs. 23–25.  The Gag Orders would unjustifiably ban, for example, Political Dissident A's videos discussing Christian values in politics (Ex. 27 at 1, 3) and the importance of education (Ex. 28 at 4).  Neither Rumble nor TMTG is under any recognized U.S. obligation to remove all content from Political Dissident A.  To the contrary, the U.S. Department of Justice—which is the "Central Authority" under the U.S.-Brazil extradition treaty, just as it is under the U.S.-Brazil MLAT—has implicitly decided that Political Dissident A's speech is *not* unlawful by declining to extradite him for speech-related crimes.  Ex. 30 at 3.

*Second*, the Gag Orders impose a content-based prior restraint that fails strict scrutiny.  Content-based restraints, "those that target speech based on its communicative content," "are presumptively unconstitutional and may be

38

justified only if the government proves that they are narrowly tailored to serve
compelling state interests." *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155,
163 (2015). The Gag Orders are directed to a specific speaker (Political
Dissident A) and content (Political Dissident A's content).

Additionally, a prior restraint arises when expression is forbidden before
it can take place. *See Nebraska Press Association v. Stuart*, 427 U.S. 539, 556
(1976) (discussing special protections afforded to "orders that prohibit the
publication or broadcast of particular information or commentary orders that
impose a 'previous' or 'prior' restraint on speech"). The Gag Orders impose a
sweeping ban on streaming or hosting Political Dissident A's content, before it
can ever reach the public. Exs. 22–25. Because prior restraints "are the most
serious and the least tolerable infringement on First Amendment rights,"
*Nebraska Press Association*, 427 U.S. at 559, they face also "heavy presumption
against [their] constitutional validity." *New York Times Co. v. United States*,
403 U.S. 713, 714 (1971).

The Gag Orders cannot survive strict scrutiny because Justice Moraes
cannot demonstrate that requiring Rumble to censor all content from Political
Dissident A is narrowly tailored to fulfill a compelling interest. For one, the
Gag Orders ban *all* content from Political Dissident A rather than limiting only
unlawful content (if any). Exs. 22–25; *see Ashcroft v. Free Speech Coalition*,
535 U.S. 234, 255 (2002) ("The Government may not suppress lawful speech as

the means to suppress unlawful speech."); *United States v. Playboy Ent. Grp.,
Inc.*, 529 U.S. 803, 804 (2000) ("[I]f a less restrictive alternative would serve
the Government's purpose, the legislature must use that alternative").  No
compelling interest exists because the orders do not identify any problematic
speech and therefore fail to justify any interest in suppressing "criminal"
speech.  Exs. 22–26.

### 2.    The Gag Orders Conflict with the CDA

The CDA codifies the "policy of the United States" to "promote the
continued development of the Internet and other interactive computer
services and other interactive media" and to "preserve the vibrant and
competitive free market that presently exists for the Internet and other
interactive computer services, unfettered by Federal or State regulation."
47 U.S.C. § 230(b)(1)–(2).  It establishes that "[n]o provider or user of an
interactive computer service shall be treated as the publisher or speaker of
any information provided by another information content provider."  *Id.*
§ 230(c)(1).  Put simply, Section 230 immunizes online service providers from
liability for content created by third parties.  *Almeida v. Amazon.com, Inc.*,
456 F.3d 1316, 1321 (11th Cir. 2006) (discussing broad immunity under CDA
and how it preempts contravening law).  U.S. courts have enjoined foreign
injunctions that contravene Section 230's protections for online service
providers.  *See, e.g., Google LLC v. Equustek Sols. Inc.*, No. 5:17-CV-04207-

EJD, 2017 WL 5000834, at *2 (N.D. Cal. Nov. 2, 2017) (granting preliminary injunction enjoining enforcement of Canadian order compelling Google to delist certain websites because it conflicts with the CDA).

To qualify for Section 230 immunity, Plaintiffs must show that (1) Plaintiffs are a "provider or user of an interactive computer service," (2) the information in question was "provided by another information content provider," and (3) the Gag Orders would hold them liable as the "publisher or speaker" of that information. *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) (quoting 47 U.S.C. § 230(c)(1)). These elements are easily satisfied here.

*First*, Plaintiffs qualify as "providers" of an "interactive computer service," which is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2). Rumble qualifies as a "provider" because it offers a video-sharing and cloud-hosting service, allowing third parties to upload videos to its servers. Rumble Decl. ¶ 4. TMTG similarly operates an online platform that hosts and moderates content posted by users—in other words, it "provides or enables" access to "multiple users" to a "computer server." TMTG Decl. ¶¶ 8–14; *see also*

*Equustek*, 2017 WL 5000834, at *2 (finding that Google is a "provider" under Section 230(f)(2) because it provides access to a computer server).

*Second*, Political Dissident A "provides" the information at issue, which Rumble and TMTG then make accessible online through its services. *Equustek*, 2017 WL 5000834, at *2 (finding that providing access to, and reproducing, the information at issue did not make Google the provider of "information," only the provider of an "interactive computer service").

*Third*, the Gag Orders would hold Rumble, and by extension TMTG, liable as the "publisher or speaker" of the information; they ordered Rumble to suspend Political Dissident A's accounts on pain of financial penalties and shut-down. Exs. 22–26.  Courts have found that requiring an intermediary to block third party content amounts to treating that intermediary as a publisher.  *Equustek*, 2017 WL 5000834, at *2 (finding that providing access to, and reproducing, the information at issue did not make Google the provider of "information," only the provider of an "interactive computer service").  Because the Gag Orders compel action by Rumble to censor third-party content published by Rumble online, and threaten fines and injury to business if it does not, the Gag Orders impermissibly hold Rumble, and by extension TMTG, liable as publishers.  *See, e.g.*, *Klayman*, 753 F.3d at 1357 (holding that the CDA "foreclosed tort liability predicated on Facebook's decisions to allow or to remove content from its website").

42

3.    The Gag Orders Are Unenforceable Under Principles of
       International Comity

Under well-settled principles of international comity, each nation is
sovereign within its own borders, and "[n]o law has any effect, of its own force,
beyond the limits of the sovereignty from which its authority is derived."
*Hilton v. Guyot*, 159 U.S. 113, 163 (1895).  "The extent to which the law of one
nation . . . shall be allowed to operate within the dominion of another nation,
depends upon . . . 'the comity of nations.'"  *Id.* (reversing order upholding
foreign judgment).  Important here, "no nation will suffer the laws of another
to interfere with her own to the injury of her citizens."  *Id.*  The Gag Orders are
unenforceable under principles of international comity.

*First*, the Gag Orders are an impermissible exercise of extraterritorial
jurisdiction, as they target U.S.-based activity (and, conversely, do not target
*any* Brazil-based activity).  These orders purport to require a U.S-based
company acting through U.S.-based personnel to remove content created by a
U.S.-based user from U.S.-hosted servers, censor content to U.S. viewers, and
require the production of information protected under the SCA.  Exs. 22–26.
By imposing a broad ban on speech that is legal and protected under American
law, reaching into Florida to require American companies to be complicit in
and operationalize that ban, and then to require them to disclose protected

43

user information, the Gag Orders usurp U.S. sovereignty over what speech is permissible within its own territory.  The Gag Orders also purport to require Rumble to appoint a legal representative in Brazil—an explicit acknowledgement that Rumble is not presently subject to the authority of the Brazilian courts, and an impermissible attempt to coerce Rumble into submitting to their jurisdiction.[9]

*Second*, enforcement of the Gag Orders is "repugnant" to United States law and policy, rendering them unenforceable here.  Under widely accepted principles reflected in the Restatement (Fourth) of Foreign Relations Law §§ 404, 408, courts refuse to enforce a foreign judgment when the claim for relief is "repugnant" to the public policy of the United States.  Critical here, the Gag Orders are "repugnant" to one of America's core policies: the First Amendment.  These orders threaten substantial penalties if Rumble, and by extension TMTG, refuse to bypass their First Amendment right to freedom of speech.  *See Sarl Louis Feraud International v. Viewfinder, Inc.*, 489 F.3d 474,

---

[9] The United States' longstanding opposition to foreign judicial overreach is further reinforced by EO 14203, which underscores this country's unequivocal commitment to protecting its citizens, entities, and allies from foreign judicial actions that lack U.S. consent. EO 14203 establishes a U.S. policy framework that rejects foreign judicial attempts to impose their legal standards extraterritorially—standards that conflict with U.S. constitutional protections and established legal norms.  It authorizes sanctions, asset freezes, and travel bans against ICC officials responsible for such conduct, signaling that the United States views these actions as not only illegitimate, but actionable.  *See Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 78–79 (3d Cir. 1994) (vacating injunctive portions of U.S. court order directed against Republic of Philippines).

480 (2d Cir. 2007) ("Foreign judgments that impinge on First Amendment rights will be found to be 'repugnant' to public policy."); *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 169 F. Supp. 2d 1181, 1192 (N.D. Cal. 2001), *rev'd on other grounds*, 433 F.3d 1199, 1214 (9th Cir. 2006) ("[T]his Court may not enforce a foreign order that violates the protections of the United States Constitution by chilling protected speech that occurs simultaneously within our borders."); *Bachchan v. India Abroad Publications Inc.*, 154 Misc. 2d 228, 231, 585 N.Y.S.2d 661, 662 (N.Y. Sup. Ct. 1992) (it is "constitutionally mandatory" to decline to enforce foreign judgments contrary to the First Amendment); RESTATEMENT § 404 TD No. 1 (2014) (comment) ("states have withheld recognition on public-policy grounds most often when the foreign judgment conflicts with the levels of protection that the U.S. Constitution mandates for freedom of speech and the press").

Enforcement of the Gag Orders would also be "repugnant" to the U.S. policy requiring that foreign orders respect established legal procedures for cross-border judicial assistance, including the MLAT, the Hague Convention, and letters rogatory. *See, e.g.*, *McCarthy v. Johnson*, 640 F. Supp. 3d 69, 76 (D.D.C. 2022) ("When weighing requests for international discovery—even requests pursuant to the Hague Evidence Convention—courts should not overlook factors relevant to international comity." (cleaned up)). Justice Moraes ignores them all. Comity strongly counsels against enforcement of

Justice Moraes's flagrant disregard for the appropriate diplomatic and legal
channels provided for cross-border judicial assistance.

4.    There Is No Plausible Defense That Should Preclude
Injunctive Relief

Having established that the Gag Orders violate U.S. law and policy and
would irreparably harm Plaintiffs if not domestically enjoined, Plaintiffs are
entitled to injunctive relief.  To the extent the Court may question whether
enjoining an order of a foreign judge—even an order that purports to act purely
extraterritorially in the United States—would itself raise issues of jurisdiction
or comity.  The answer is no.  Justice Moraes, in issuing the Gag Orders and
directing them into this District, has plainly submitted to this Court's
jurisdiction.  This Court is therefore fully empowered to issue the injunction
requested by Plaintiffs.

As an initial matter, questions of personal jurisdiction, international
immunity, and the like implicate affirmative defenses, for which Justice
Moraes bears the burden of proof, even at the preliminary injunction stage.
"[T]he burdens at the preliminary injunction stage track the burdens at trial."
*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429
(2006); *see also MC3 Investments LLC v. Local Brand, Inc.*, 661 F. Supp. 3d
1145, 1159 (N.D. Fla. 2023).  The defendant bears the burden at trial, and thus
at the preliminary injunction stage, on all affirmative defenses, including the

sorts of defenses that he might be reasonably anticipated to raise here. *See Perlman v. Delisort-Theodule*, 451 Fed. App'x 846, 848 (11th Cir. 2012) (lack of personal jurisdiction is an affirmative defense); *Sheafen Kuo v. Gov't of Taiwan*, 802 Fed. App'x 594, 596 (2d Cir. 2020) (same, for statutory foreign immunity); *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010) (same, for common law foreign immunity); *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004) (same, for act of state doctrine). The Court therefore should not even consider these defenses unless and until they are raised, and proved, by the defendant. *Gonzales*, 546 U.S. at 428; *Swain v. Junior*, 958 F.3d 1081, 1092 (11th Cir. 2020).

Even if the Court were to consider these potential defenses, they would have no merit.

a.   *The Court Has Personal Jurisdiction Over Justice Moraes*

To evaluate whether personal jurisdiction exists, a court (1) applies Florida's long-arm statute and then (2) analyzes whether the exercise of that personal jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013). Here, this Court has personal jurisdiction over Justice Moraes under Florida Statute § 48.193(1)(a)(2), and exercise of that jurisdiction comports with Due Process.

47

Florida Statute § 48.193(1)(a)(2) permits Florida courts to assert
jurisdiction over any person who "commit[s] a tortious act within this state."
Fla. Stat. § 48.193(1)(a)(2). Courts interpret this standard broadly to include
out-of-state actions that yield in-state harm. *See Licciardello v. Lovelady*, 544
F.3d 1280, 1283 (11th Cir. 2008) (interpreting long-arm statute to bring
intellectual property infringement within the scope of a "tortious" act). Even
claims not traditionally labeled "torts"—such as those rooted in constitutional
or statutory rights—can satisfy the standard when they proximately inflict
damage in Florida.

Because Truth Social (owned by TMTG) relies on Rumble's Florida-based
servers for its video streaming and content delivery, these extraterritorial
demands also directly harm TMTG's operations within Florida (TMTG Decl.
¶¶ 09–11), triggering the tortious act requirement under Section
48.193(1)(a)(2). *See, e.g.*, *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d
1339, 1353 (11th Cir. 2013) ("a nonresident defendant commits 'a tortious act
within [Florida]' when he commits an act outside the state that causes injury
within Florida").

Here, all of Plaintiffs' claims flow from Justice Moraes's Gag Orders,
which require action in Florida. The Gag Orders require Rumble, from Florida,
to (a) shut down Political Dissident A's accounts, (b) provide protected user
information stored on U.S.-based servers, (c) hire and designate, from Florida,

a Brazilian legal representative, and (d) pay daily penalties. The Gag Orders impose an economic harm felt in Florida, Rumble's home—and ultimately to shut down Rumble, an injury which Rumble would also suffer in its home forum. Rumble Decl. ¶¶ 11–16. Justice Moraes also attempted to enforce the Gag Orders by sending them via e-mail to Rumble's legal department (legal@rumble.com) and to Rumble's interim general counsel, both in Florida. Ex. 22.

This Court's exercise of jurisdiction over Justice Moraes also comports with Due Process, which allows for "personal jurisdiction over a nonresident defendant" if "his contact with the state is such that he has "'fair warning' that he may be subject to suit there." *Licciardello v. Lovelady*, 544 F.3d 1280, 1284 (11th Cir. 2008). A defendant has "fair warning" if he "has 'purposefully directed' his activities at residents of the forum," and the "litigation results from alleged injuries that 'arise out of or relate to' those activities." *Id.* (cleaned up). So long as the conduct creates a "substantial connection" with Florida, "even a single act can support jurisdiction" and even if he "has no other contacts" with Florida. *Id.* (cleaned up).

Here, Justice Moraes has intentionally and purposefully directed his conduct toward "Rumble Inc.," a Florida-based corporation with its personnel, servers, data centers, user information, user relationships, and business partnerships located in this District. *See* Compl. ¶¶ 2, 4–10, 14. The Gag

Orders compel Rumble—from its Florida-based headquarters and
infrastructure (and without any Brazil operations)—to suspend accounts and
turn over confidential account information in violation with federal law.
*Id.* ¶¶ 11, 13–14. The Gag Orders, served on Rumble, Inc. via its general e-
mail for the Legal Department in Florida, threaten daily fines and potential
shutdown of Rumble whose main servers are in this District (with none in
Brazil). *Id.* Because TMTG's functionality exists in Rumble's infrastructure,
these orders also impede TMTG's operations. TMTG Decl. ¶¶ 9–13, 16–17.
Justice Moraes's conduct is directed at Florida, and the harm (compliance with
the Gag Orders) would be suffered in Florida. *Id.*

If there is any question of whether Justice Moraes subjected himself to
jurisdiction here, he resolved those questions by, the day after he was sued in
this District, responding to that lawsuit by issuing a new Gag Order and e-
mailing it to Rumble in Florida. Ex. 25. This intentional and purposeful
conduct directly interferes with Plaintiffs' operations, legal obligations, and
freedom of speech in Florida, giving rise to specific jurisdiction in Florida. *See,
e.g.*, *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d
1199, 1209 (9th Cir. 2006) (finding that French orders requiring Yahoo! to
remove certain listings from its website gave rise to specific jurisdiction in
California because, even if "the effect desired by the French court would be felt
in France," the orders "require Yahoo! to make some changes to those servers"

"located in California" and "to the extent that any financial penalty might be imposed pursuant to the French court's orders, the impact of that penalty would be felt by Yahoo! at its corporate headquarters in California").[10]

### b.    *Justice Moraes Is Not Entitled to Immunity*

Justice Moraes cannot escape this Court's jurisdiction based on a claim that he is immune from suit under principles of foreign sovereign immunity, either.  The determination of whether an official purporting to act on behalf of a foreign state is entitled to immunity from suit for his or her alleged conduct is "governed by the common law" of "foreign official immunity."  *Samantar v. Yousuf*, 560 U.S. 305, 325 (2010).[11]  Under the common law, the foreign official bears the burden "to establish three criteria.  'First, whether the actor is a public minister, official, or agent of the foreign state.  Second, whether the acts were performed in her official capacity.  And third, whether exercising jurisdiction would serve to enforce a rule of law against the foreign state.'"  *Marron v. Moros*, 2023 WL 6356969, at *6 (S.D. Fla. Sept. 29, 2023) (quoting

---

[10] Alternatively, this Court has jurisdiction under Federal Rule of Civil Procedure 4(k)(2), which requires that "(1) plaintiff's claims must arise under federal law; and (2) the exercise of jurisdiction must be consistent with the Constitution and laws of the United States." *Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1337 (S.D. Fla. 2016).  Plaintiffs' claims obviously arise under federal law, and as set out above, jurisdiction comports with constitutional Due Process.

[11] As explained by the Court in *Samantar*, statutory immunity under the Foreign Sovereign Immunities Act is not available to individual foreign officials, as opposed to agencies or instrumentalities of foreign governments.  Individuals may only have foreign sovereign immunity, if at all, under the pre-FSIA common law.

*Lewis v. Mutond*, 918 F.3d 142, 146 (D.C. Cir. 2019)); *see also* RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW § 66(f).  While there is no question that Justice Moraes is a foreign official, he is not entitled to immunity because he cannot establish the second and third criteria.

Justice Moraes's Gag Orders were not issued in his "official capacity," for purposes of the immunity analysis, because they far exceeded the scope of his authority under well-established law.  Courts have recognized that "a lawsuit against a foreign official acting *outside the scope of his authority* does not implicate any of the foreign diplomatic concerns involved in bringing suit against another government in United States courts."  *Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012) (quoting *In re Estate of Ferdinand Marcos, Human Rights Litigation*, 25 F.3d 1467, 1472 (9th Cir. 1994)) (cleaned up; emphasis added).

As detailed above, at a minimum, the extraterritorial reach of the Gag Orders exceeds Justice Moraes's authority under clearly established procedures governing cross-border legal matters that he is bound to follow, including the United States-Brazil MLAT, the Hague Service Convention, and the traditional process of letters rogatory.  *See infra* at 23–25.  Justice Moraes intentionally circumvented those procedures because he knows that the United States would never enforce or otherwise recognize the Gag Orders, which clearly violate both the First Amendment and U.S. statutory law.  Justice

Moraes therefore cannot claim immunity in connection with his issuance of the Gag Orders, which are *ultra vires* and are not entitled to recognition under U.S. law. *See Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 439–40 (S.D.N.Y. 2004) (no immunity where U.S. did not recognize PLO).

Even if Justice Moraes could show that his actions in issuing the Gag Orders somehow were within the scope of his legitimate authority, he would not be entitled to immunity because he would fail at the third step: he cannot show that "the remedies sought by Plaintiff[s] serve to enforce a rule of law against the" government of Brazil. *Lewis*, 918 F.3d at 146. This criterion is met where, for instance, the plaintiff is "seeking compensation out of state funds," or the relief sought would require the foreign state "to take specific action." *Id.* at 147. That is not the case here. Plaintiffs seek only declaratory and injunctive relief preventing enforcement of the Gag Orders in the United States unless and until they are validly presented through recognized international channels. *See* Compl. at 37. Plaintiffs seek no monetary relief from either Justice Moraes or the Brazilian government, nor would the requested relief require the Brazilian government to take any action. *Id.* The requested relief is entirely prohibitory in nature, requiring only that orders issued by a foreign judge against U.S.-based entities that clearly violate U.S. law, including the First Amendment of the Constitution and the CDA, be deemed unenforceable in the courts of the United States. Under these

circumstances, Justice Moraes is "not entitled to the conduct-based foreign
official immunity." *Lewis*, 918 F.3d at 147.

*    *    *

In sum, the Gag Orders are unlawful under U.S. law.  Surely knowing
this—after all, his extradition request for Political Dissident A had already
been, in part, denied on the grounds that the "crime" he was pursuing was no
crime at all—Justice Moraes evaded established means for transmitting
foreign court orders to the United States in an attempt to avoid the scrutiny
that the U.S. Central Authority or courts would put on the Gag Orders had he
used one of those means.  In doing so, he exceeded his authority and acted *ultra
vires*.  The Court should enter an order declaring the Gag Orders unenforceable
in the United States.

### C.    No Bond Should Be Required

Rule 65(c) gives courts wide discretion to set a bond amount
accompanying a preliminary injunction, and even to dispense with any bond
requirement.  *See also BellSouth Telecommunications, Inc. v. MCIMetro Access
Transmission Services*, LLC, 425 F.3d 964, 971 (11th Cir. 2005) ("[I]t is well-
established that the amount of security required by the rule is a matter within
the discretion of the trial court ...[, and] the court may elect to require no
security at all.").  Here, no bond should be imposed.  The purpose of such a
bond is solely to act as "security in an amount that the court considers proper

54

to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  No conceivable harm to Justice Moraes can result from enjoining the extraterritorial enforcement of the Gag Orders in the United States, and so no bond should be required.  *See* U*nited Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1376 (S.D. Fla. 2002) ("No bond will be required inasmuch as no conceivable economic harm can result from the injunction.").

## V.    CONCLUSION

The Court should grant the temporary restraining order and preliminary injunction, in the form proposed by Plaintiffs.

Dated: February 22, 2025                    Respectfully submitted,

By:    _____
       E. Martin De Luca*
       BOIES SCHILLER FLEXNER LLP
       55 Hudson Yards
       New York, NY 10001
       (212) 446-2300
       mdeluca@bsfllp.com

       *Lead Counsel for Plaintiff*
       *Rumble Inc.*

       Matthew L. Schwartz*
       BOIES SCHILLER FLEXNER LLP
       55 Hudson Yards
       New York, NY 10001
       (212) 446-2300

Andrew H. Smith*
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. NW
Washington, DC 20005
(202) 274 1163

Daria Pustilnik
FLA. BAR NO. 92514
BOIES SCHILLER FLEXNER LLP
100 S.E. 2nd Street, Suite 2800
Miami, FL 33131
(305) 539-8400

*Counsel for Plaintiff Rumble Inc.*



_____

Caryn G. Schechtman*
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020
caryn.schechtman@us.dlapiper.com
(212) 335-4500

*Lead Counsel for Plaintiff
Trump Media & Technology Group
Corp.*

Christopher G. Oprison
DLA Piper LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131
(305) 423-8500

*Counsel for Plaintiff
Trump Media & Technology Group
Corp.*

*\*Admitted pro hac vice*

56

## **CERTIFICATION**

I hereby certify that Justice Moraes was not given notice because notice should not be required. Immediate and irreparable harm will result if this motion is delayed to provide notice. Any advance disclosure to Justice Moraes risks hastening enforcement actions abroad that will disrupt Rumble's and TMTG's operations and business in Florida.


Dated: February 22, 2025

By: _____

  E. Martin De Luca