# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| RUMBLE INC. and TRUMP MEDIA & TECHNOLOGY GROUP CORP.<br><br>        Plaintiffs,<br><br>    v.<br><br>ALEXANDRE DE MORAES, Justice of the Supreme Federal Tribunal of the Federative Republic of Brazil<br><br>        Defendant. | **Case No. 25-cv-00411-MSS-AAS**<br><br>**<u>AMENDED COMPLAINT</u>**<br><br>**Demand for a Jury Trial Permanent Injunctive Relief Requested** |

Plaintiffs Rumble Inc. ("Rumble") and Trump Media & Technology Group Corp. ("TMTG") (together, the "Plaintiffs") bring this action against Alexandre de Moraes, Justice of the Supreme Federal Tribunal of the Federative Republic of Brazil ("Justice Moraes"), and in support state as follows:

## INTRODUCTION

1.     Rumble and TMTG bring this action to stop Justice Moraes's *ultra vires* attempts to illegally censor American companies operating primarily on American soil.

2.     Acting under the guise of the Supreme Federal Tribunal of the Federative Republic of Brazil ("STF"), Justice Moraes has issued sweeping

orders to suspend multiple U.S.-based accounts ("Banned Accounts") of a well-known politically outspoken user, Allan dos Santos ("dos Santos"), ensuring no person in the United States can see his content ("Gag Orders").[1]

3.    The Gag Orders, as issued, censor legitimate political discourse in the United States, undermining fundamental constitutional protections enshrined in the First Amendment, clashing with the Communications Decency Act and Stored Communications Act, and defying basic comity principles.  The Gag Orders further require Rumble, a Florida-based company with no subsidiaries, presence, personnel or assets in Brazil, to designate a legal representative in Brazil solely for the purpose of accepting service of the Gag Orders and submitting to Justice Moraes's authority.

4.    Rumble and TMTG jointly seek a judgment declaring Justice Moraes's Gag Orders unenforceable in the United States.  Allowing Justice Moraes to muzzle a vocal user on an American digital outlet would jeopardize our country's bedrock commitment to open and robust debate.  Neither extraterritorial dictates nor judicial overreach from abroad can override the freedoms protected by the U.S. Constitution and law.

## THE PARTIES

5.    Plaintiff Rumble is a Delaware corporation with its principal place

---

[1] Since the filing of the original complaint, it has been widely reported in the media that Political Dissident A is Allan dos Santos.

of business in Longboat Key, Florida.  Through its subsidiaries, Rumble owns and operates a video (rumble.com) and cloud-hosting environment designed to foster robust discussion of different viewpoints and opinions.

6.     TMTG is a Delaware corporation with its principal place of business in Sarasota, Florida.  TMTG, through a wholly owned subsidiary, operates the Truth Social platform, a forum designed to facilitate open discourse and uphold the American tradition of free expression for its users.

7.     Truth Social utilizes Rumble's cloud-based hosting and video-streaming infrastructure to deliver multimedia content to its user base.  The forced shutdown of Rumble interferes with Truth Social's operations.

8.     Defendant Justice Moraes is a member of the STF, the highest court in Brazil.  He resides in Brazil.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the First Amendment to the U.S. Constitution; the Communications Decency Act ("CDA"), 47 U.S.C. § 230; the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701–2713; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.  An actual controversy exists because the Gag Orders compel the disclosure of user records or other information in violation of the SCA and require censorship of lawful content within the United States, conflicting with Plaintiffs' First Amendment and

3

statutory rights. Jurisdiction over the state law claims for tortious interference with contractual relations and tortious interference with prospective business relations are also appropriate under 28 U.S.C. § 1367(a) and principles of pendent jurisdiction because those claims are substantially related to the federal claims.

10. Alexandre de Moraes, a Justice of the STF, has purposefully directed his conduct toward Florida-based corporations and their servers, data centers, operations, and user relationships located in this District. He attempted to enforce the Gag Orders by sending them via email to Rumble's legal counsel in Florida (legal@rumble.com) and to Rumble's interim general counsel in Florida. The Gag Orders demand the suspension and prohibit the creation of accounts, require Rumble to turn over account-holder information, impose daily fines, and compel the shutdown of Rumble in Brazil—a Florida corporation with servers located in this District—and potentially elsewhere. Compliance with the Gag Orders would require Rumble to make changes to those servers, which would directly harm TMTG—whose global online platform depends, in part, on those servers and is also based in Florida. The Gag Orders therefore directly interfere with Plaintiffs' operations, business relationships, and speech in Florida. Additionally, the impact of the daily penalties is felt by Rumble at its corporate headquarters in Florida. The Gag Orders also require Rumble, whose management resides in this District, to

designate an agent to accept legal process in Brazil, thereby submitting to Justice Moraes's authority. These acts satisfy the minimum contacts test, conferring personal jurisdiction consistent with due process.

11. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to the claims alleged in this Complaint occurred in this District. Both Rumble and TMTG have their principal place of business in this District, Rumble's servers reside in this District, and compliance with the Gag Orders would occur in this District. By targeting these in-district operations, Justice Moraes's censorship orders directly harm Rumble's and TMTG's constitutionally protected speech, business, and lawful platform activities within the Middle District of Florida.

12. As a Justice of the STF, Justice Moraes is an official of the Brazilian government. While foreign states and their agencies and instrumentalities typically enjoy immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611, the FSIA does not apply to an official purportedly "acting on behalf of the foreign state[.]" *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010). Any claim of immunity by a foreign official instead is governed by common-law principles.

13. Under the common law of foreign sovereign immunity, an official is entitled to immunity only for acts performed in his or her official capacity, and only where exercising jurisdiction over that official would be akin to

5

enforcing a rule of law against the foreign state.  An official does not act in his or her official capacity where the challenged acts are outside the scope of that official's authority—*i.e.*, the acts are *ultra vires*.  Foreign officials therefore are not entitled to immunity for *ultra vires* acts.  Even where the challenged acts are within the scope of the official's authority, immunity is still unavailable if the relief requested would not have the effect of enforcing a rule of law against the state.

14.    As alleged herein, the blatantly unlawful Gag Orders are plainly outside the scope of Justice Moraes's authority under both Brazilian law and multiple treaties between the United States and Brazil.  On that basis alone, the legality of the Gag Orders, and Justice Moraes's unlawful conduct in issuing them, are not immune from the scrutiny of the courts of the United States.  The Court thus has subject-matter jurisdiction and may properly exercise authority over the claims and relief sought in this action.

**<u>FACTUAL ALLEGATIONS</u>**

**I.    Rumble and TMTG Promote Free Speech**

15.    Rumble provides cloud-based storage and processing services for user-generated content, including video uploads, transaction records, and account data.  The company was founded in 2013 as a video-sharing service dedicated to free speech, open discourse and debate.  It began its beta cloud-hosting services in 2022, with a public launch in 2024.

16.    From its earliest days, Rumble intentionally set itself apart from larger service providers by providing a user-friendly environment in which controversial or unconventional viewpoints would not be censored unless it was unlawful or violated Rumble's content moderation policy and Terms and Conditions of Use and Agency Agreement ("Rumble Terms of Use").

17.    By 2021, Rumble had evolved into a thriving haven for independent content creators—ranging from citizen journalists to educators—who sought an alternative to mainstream tech providers perceived as overzealous in censoring legally protected viewpoints.  In doing so, Rumble cultivated a robust user community and became widely regarded as a key counterbalance to those bigger service providers whose restrictive policies had begun to erode public trust in the marketplace of ideas.

18.    Rumble offers its video-sharing and cloud-hosting services to users under its posted Terms of Use, which contain all essential terms, including the obligations of both the user and Rumble, disclaimers, and dispute-resolution provisions.  By creating an account and continuing to use Rumble's services, users manifest acceptance of the Rumble Terms of Use, which appear prominently at account sign-up and is a condition to creating and using a Rumble account.  Users receive access to Rumble's video-sharing and cloud-hosting services, while Rumble derives revenue from user-generated content, advertising, and other monetization avenues.  The Terms of Use set forth

definite rights and obligations, including Rumble's exclusive right to suspend or terminate user access to Rumble's services and users' rights to upload and manage video content through Rumble's platform.

19.    In addition to existing contracts with its user base, Rumble continuously cultivates prospective relationships with new users who regularly join the platform, generating traffic, advertising revenue, and other monetization opportunities.

20.    Rumble has a comprehensive content moderation policy that it rigorously enforces and continues to abide by applicable U.S. laws while steadfastly protecting its users' freedom of expression.  As a neutral company with transparent policies and innovative cloud services, Rumble stands today as a respected, fast-growing presence in the digital publishing sphere, welcoming a broad array of perspectives that enrich the global exchange of information.

21.    Truth Social was launched in 2022 as an online platform expressly rooted in American First Amendment values, with the stated mission of opening up the Internet and giving people their voices back.  Truth Social was established as a safe harbor for free expression amid increasingly harsh censorship by other platforms.

22.    Truth Social offers user profile creation, content-sharing features, and access to news feeds to users under its Terms of Service, which contain key

provisions, including the obligations of both the user and Truth Social, disclaimers, content ownership and licensing terms, dispute resolution mechanisms, and account-management policies. By creating an account and continuing to use Truth Social's services, users manifest acceptance of the Terms of Service, a link to which appears prominently at account sign-up and acceptance of which is a condition to creating a Truth Social account. As part of the agreement, TMTG provides continuous access to the Truth Social platform, technical support, and related services. In return, users provide user-generated content and engagement, which TMTG leverages for platform growth, monetization through advertising, and enhanced user interactions.

23.     Truth Social avoids blanket deplatforming or shadow banning of lawful content that complies with its Terms of Service—opting instead for what TMTG believes is a robust, fair, and viewpoint-neutral discretionary moderation system that is consistent with TMTG's objective of maintaining a public, real-time platform where any user can create content, follow other users, and engage in an open and honest global conversation without fear of being censored or cancelled due to their political viewpoints.

24.     TMTG has placed emphasis on building a platform for users to freely express themselves through Truth Social; its brand and business model are built on distinguishing itself from other platforms that have engaged in various forms of censorship, including unjustified bans of user accounts at the

9

behest of government officials.

25.    Neither Rumble nor TMTG has any entities, operations, employees, bank accounts, or businesses in Brazil.

26.    In 2021, Rumble and TMTG entered into a Cloud Services Agreement (the "Cloud Services Agreement"), which contains terms regarding the obligations of both Rumble and TMTG concerning hosting, streaming, and technology support services, payment schedules, termination conditions, and dispute-resolution provisions.  Pursuant to this Agreement, Rumble has served as Truth Social's primary video-streaming and hosting provider since 2022. Pursuant to the Cloud Services Agreement and service orders thereunder, TMTG agreed to pay certain fees to Rumble in exchange for Rumble's services. This payment obligation, in turn, provides Rumble with revenue and TMTG with a secure, reliable hosting solution.    The Cloud Services Agreement is a critical business relationship for Rumble and TMTG because Truth Social relies, in part, on Rumble's technology infrastructure to deliver its services— including videos embedded in Truth Social posts to Truth Social's users.  As a result, the forced shutdown of Rumble in Brazil directly jeopardized Rumble's ability to perform under this contract and fulfill its obligations to TMTG. Similarly, the forced shutdown of Rumble has adversely affected Truth Social's ability to deliver its service to Truth Social users in Brazil.

27.    TMTG has established and continues to develop prospective

business relationships with users of its platform, advertisers, and other strategic partners. TMTG regularly onboards new users, has ongoing advertising negotiations, and fosters collaborations with influencers and content creators. TMTG's track record of growth in user engagement and advertising demonstrates the ongoing nature of these relationships.

## II. Justice Moraes Leads a Sweeping Campaign to Silence Political Dissent in Brazil

28.     In 2017, Justice Moraes ascended to the STF following a plane crash that killed his predecessor, Justice Teori Zavascki. Justice Zavascki had been presiding over Operation Car Wash ("Lava Jato"), a multi-billion-dollar investigation central to Brazil's anti-corruption drive.

29.     Although Justice Moraes had no prior experience serving as a judge, the Brazilian Senate confirmed his appointment on February 22, 2017, and he was sworn in the following month.

30.     In March 2018, a major Brazilian newspaper reported that Justice José Antonio Dias Toffoli—a colleague of Justice Moraes on the STF—was implicated in Operation Car Wash and linked to Odebrecht (a conglomerate that admitted to roughly US $788 million in bribes).

31.     Within three days of that exposé, on March 14, 2019, the STF—via Justice Toffoli—launched Inquiry No. 4781, known as the "Fake News Inquiry." The STF invoked Article 43 of the STF's Internal Regulations, an

Article that had generally been reserved for administrative matters, to unilaterally empower itself to open a criminal-style probe *ex officio*, bypassing the Public Prosecutor's Office and district level courts.  Critics in Brazil and abroad blasted this as unconstitutional, warning that the STF, the highest court in the land, was effectively granting itself the roles of investigator, prosecutor, and judge under the banner of combating "fraudulent news, offenses and threats" against the STF and its justices.[2]

32.     Justice Moraes led the STF's first inquiry, and his first action was to order the removal of an article implicating Justice Toffoli and threatening a daily fine of R $100,000 (about US $20,000) unless it was removed from the internet.

33.     Although Justice Moraes has publicly professed a "minimalist" approach to online platform regulation—once calling for a "free market of ideas"—he also blames platforms for "allow[ing] themselves to be used" by what he calls "right wing extremists."[3]

## III.    Justice Moraes Turns the Censorship Campaign Against U.S. Companies and U.S. Persons

34.     Since 2018, the so-called "Fake News Inquiry" has transformed

---

[2] *Unveiling Authoritarianism: The 'Fake News Inquiry' in Brazil and Its Inquisitional Assault on the Rule of Law*, HUM. RIGHTS HERE (Jan. 5, 2024), https://www.humanrightshere.com/post/unveiling-authoritarianism-the-fake-news-inquiry-in-brazil-and-its-inquisitional-assault-on-the-rule-of-law.

[3] *Brazil Judge Who Battled Elon Musk Says Social Media Poses Risk to Democracy*, FIN. TIMES (Dec. 5, 2024) https://www.ft.com/content/091839c5-41b7-49be-ae35-47f15ce22e5f.

into a sweeping mechanism for digital repression, deployed against political opponents and independent voices in the press.  Under the direction of Justice Moraes, the inquiry has metastasized far beyond any legitimate investigatory scope.  Justice Moraes has routinely issued sealed orders compelling U.S.-based online service providers to ban politically outspoken users across their entire platform, including in the United States, based on allegations of "criminal" or "anti-democratic speech."

35.    Justice Moraes's censorship orders are routinely backed by the threat of severe penalties—including substantial daily fines, full-platform blocking within Brazil, and even criminal liability for platform executives, both Brazilian and American.  Since 2022, Justice Moraes has reportedly ordered the suspension of nearly 150 social media accounts, targeting a wide array of individuals including elected officials, journalists, legal professionals, entertainers, and private citizens.  The overwhelming majority of these targets are critics of current Brazilian President Luiz Inacio "Lula" da Silva, Justice Moraes, or Brazilian institutions under their control.

36.    In a single 2020 episode, Justice Moraes forced the removal of 16 X (formerly Twitter) accounts and 12 Meta (Facebook) accounts tied to prominent supporters of former Brazilian President Jair Bolsonaro, using "disinformation" claims to justify the purge.

37.    Flavia Cordeiro Magalhães is a dual citizen of the United States

13

and Brazil who has resided in Pompano Beach, Florida, for more than twenty years. She is married and the mother of an 18-year-old daughter. Her husband and daughter are both U.S. citizens. In 2023, without notice, Justice Moraes issued an order banning Ms. Magalhães's X account, based on content she had posted from within the United States.[4] Her posts, which included questioning the legitimacy of Brazil's 2022 elections, were clearly protected under the First Amendment. Unaware of the censorship order, which was never served to her in the United States, Ms. Magalhães continued posting, leading Justice Moraes to launch a criminal investigation and order her preventive detention for purported noncompliance with his orders, of which she had never been informed.

38.    Later that year, while entering Brazil using her valid U.S. passport, Ms. Magalhães was notified that her Brazilian passport was under restriction.[5] Although she entered the country lawfully, Justice Moraes charged her with using a "false document"—namely, her U.S. passport—to enter Brazilian territory. Her counsel's repeated requests for access to the case file and charging documents were denied on the grounds that the matter was sealed, as is Justice Moraes's routine practice. When counsel submitted

---

[4] Didi Rankovic, *Brazilian Supreme Court Justice Orders Arrest of US Citizen for Political Speech,* RECLAIM THE NET (Mar. 6, 2025), https://reclaimthenet.org/brazil-arrest-warrant-us-citizen-free-speech-crackdown.
[5] *Id.*

documentation establishing that Ms. Magalhães had never received notice of any judicial orders, the court took no action and offered no response.[6]

39.    Rodrigo Constantino is an American political commentator, economist, and writer who currently resides in Florida.  Between 2022 and 2023, Justice Moraes ordered the suspension of Mr. Constantino's accounts on Instagram, Facebook, YouTube, and X, targeting him for political commentary critical of the Brazilian judiciary and executive branches.[7]  Following these suspensions, Justice Moraes initiated criminal proceedings against Mr. Constantino under the "Fake News" Inquiry.  Mr. Constantino contested the legitimacy of the proceedings, asserting that Justice Moraes had initiated the inquiry arbitrarily and in retaliation for Mr. Constantino's political speech.  As a consequence of these proceedings, Mr. Constantino was terminated from his job as a commentator in a Brazilian media outlet that had itself been publicly accused by Justice Moraes of disseminating disinformation.

40.    Despite Mr. Constantino's U.S. citizenship and residence in the United States, Justice Moraes ordered the freezing of his assets and the invalidation of his Brazilian passport, actions consistent with those taken against other U.S.-based dissidents and critics.

---

[6] *Id.*

[7] *Judge De Moraes Seizes Passports of Bolsonarist Journalists*, MERCO PRESS, (Jan. 5, 2023), https://en.mercopress.com/2023/01/05/judge-de-moraes-seizes-passports-of-bolsonarist-journalists.

41.    Judge Ludmila Lins Grilo is a former Brazilian magistrate who now resides in the United States as a political asylee.  In 2019, Judge Grilo publicly criticized the concentration of power within the STF, warning that it was eroding the "functional independence" of Brazilian democratic institutions.[8]  In retaliation, in or around September 2022, Justice Moraes issued an order mandating the suspension of all of Judge Grilo's social media accounts.[9]  Shortly thereafter, Justice Moraes included her in an ongoing criminal investigation, ordered the seizure of her financial records, and directed the takedown of the website of a company where she served as partner and instructor, severely damaging her livelihood.  The stated basis for including Judge Grilo in the criminal inquiry was her well-known association with dos Santos, the target of the Gag Orders in this case.  In November 2022, she fled to the United States, where she sought political asylum.

42.    Following her public disclosure on January 3, 2024, that she had sought political asylum in the United States, Justice Moraes escalated by ordering the suspension of her Brazilian passport and the freezing of her remaining financial assets.[10]    Judge Grilo has since resumed her online

---

[8] *Exiled Brazilian Judge Ludmila Lins Grilo Speaks Out About Brazilian Judiciary Dictatorship*, GONDOLATH (Apr. 13, 2024), https://gondolath.org/2024/04/13/exiled-brazilian-judge-ludmila-lins-grilo-speaks-out-about-brazilian-judiciary-dictatorship/.
[9] *Petition 9.935 Federal District* (Sept. 23, 2022),
https://static.poder360.com.br/2024/04/Decisao-X-Musk-9935-3-18abr2024.pdf.
[10] Ludmila Lins Grilo, INSTAGRAM (Jan. 3, 2024),
https://www.instagram.com/p/C1o5LkoLKD6/.

presence while explicitly informing her Brazilian followers that access to her
content is only possible via VPN due to the nationwide bans still enforced at
the direction of Justice Moraes.

43.    Paulo Figueiredo is a Florida-based conservative commentator and
U.S. legal permanent resident for over ten years who openly questioned the
breadth of "anti-democratic" speech rules and criticized Justice Moraes's
reliance on sealed directives.  Until December 30, 2022, Figueiredo regularly
appeared on Brazil's JP News, a top-rated television network.  Figueiredo built
a substantial digital following—1.4 million on Twitter, 1.1 million on YouTube,
and 800,000 on Instagram—and gained influence by dissecting STF actions
and controversial policies.[11]  His posts often went viral, prompting intense
debate in both Brazil and among diaspora communities.  As Figueiredo's
critiques reached U.S. audiences, he emerged as a bridge connecting American
free-speech ideals with the Brazilian discourse.  By challenging the notion of
"anti-democratic" content, Figueiredo became a prime target for Justice
Moraes's sealed takedowns.

44.    In December 2022, in the midst of intense debate over the October
2022 Brazilian presidential election, online platforms and service providers
received Justice Moraes's sealed instructions to block all of Figueiredo's U.S.

---

[11] *Brazil: A Crisis of Democracy, Freedom & Rule of Law?*, *Hearing Before H. Comm. on
Foreign Affs. – Subcomm. on Glob. Health, Glob. Hum. Rights, and Int'l Orgs.,* 118th Cong.
(2024) (statement of Paulo Figueiredo, Journalist).

based accounts within two hours—on penalty of severe fines—erasing him from an audience of millions.[12]   At the same time, Justice Moraes froze Figueiredo's assets (despite the fact he was a U.S. resident) and voided his Brazilian passport, demonstrating a systematic effort to punish and deter lawful expression.[13]   These actions by Justice Moraes effectively forced U.S. social media platforms to deplatform and ban an American resident, depriving U.S. audiences of Figueiredo's content.

45.    In October 2022, Elon Musk purchased X, promising more open moderation than under its prior management.   This clashed directly with Justice Moraes's demands to remove accounts he labeled "anti-democratic." Almost immediately after Musk's takeover, Justice Moraes imposed sealed orders demanding the removal of accounts with tight compliance deadlines and thousands in daily fines.[14]   Musk denounced these demands as an abuse of power and infringement on free speech, vowing that X would only remove posts clearly violating U.S. law.   In response, Justice Moraes threatened X's Brazilian legal representative with arrest and ordered the platform blocked nationwide.[15]   Musk faced a criminal investigation for alleged obstruction of

---

[12] *Id.*

[13] *Id.*

[14] Reuters, *What Is Elon Musk's Feud with a Brazilian Supreme Court Justice About?*, REUTERS (Aug. 30, 2024), https://www.reuters.com/technology/what-is-elon-musks-feud-with-brazilian-supreme-court-justice-about-2024-08-29/.

[15] *Id.*

justice after refusing to comply.

46.     On April 17, 2024, a U.S. House Judiciary Committee and Select Subcommittee on the Weaponization of the Federal Government staff report titled "The Attack on Free Speech Abroad and the Biden Administration's Silence: The Case of Brazil" documented Justice Moraes's escalating conduct.[16] The report identified 51 separate takedown orders that Justice Moraes issued to X and 37 issued by the Superior Electoral Tribunal of Brazil.  It highlighted how sealed directives and the threat of punitive fines—often tens of thousands of dollars per day—systematically forced online video-sharing platforms and other online service providers like X to expunge accounts and silence law-abiding voices.  The House report noted that Justice Moraes specifically sought to ban high-profile critics across multiple networks, illustrating the breadth of the campaign and the harsh penalties faced by anyone whom Justice Moraes deems "anti-democratic."

47.     In September 2024, in an effort to increase the pressure on X and compel payment of X's fines (which at that point exceeded US $3 million), Justice Moraes ordered the freezing of Starlink's bank accounts in Brazil,

---

[16] STAFF OF H. COMM. ON THE JUDICIARY & SELECT SUBCOMM. ON THE WEAPONIZATION OF THE FED. GOV'T, 118TH CONG., THE ATTACK ON FREE SPEECH ABROAD AND THE BIDEN ADMINS.' SILENCE: THE CASE OF BRAZ. (May 7, 2024), //efaidnbmnnnibpcajpcglclefindmkaj/https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/The-Attack-on-Free-Speech-Abroad-and-the-Biden-Administrations-Silence-The-Case-of-Brazil-Part-II-5-7-2024.pdf.

another U.S. company.[17]   In response, X stated "Regardless of the illegal
treatment of Starlink in freezing our assets, we are complying with the order
to block access to X in Brazil.  We continue to pursue all legal avenues, as are
others who agree that @alexandre's recent order violates the Brazilian
constitution."  X eventually yielded, paying around US $5 million in fines so
Brazilians could regain access to the platform.[18]

48.    The payment by X of the US $5 million fine imposed by Justice
Moraes did not abate his pattern of coercion against U.S. persons and
businesses.  The day after this lawsuit was filed, on February 20, 2025, Justice
Moraes issued an order compelling X to immediately pay an additional fine of
R$8.1 million (approximately US $1.4 million) for allegedly failing to comply
with his censorship directives.[19]  The fine arose from Justice Moraes's demand
that X globally remove specific accounts and content he deemed "anti-
democratic," notwithstanding that such content on American soil is plainly
protected under U.S. law.  Rejecting all objections raised by the company,
Justice Moraes ordered immediate payment under threat of asset seizure,

---

[17] Mauricio Savarese, *Brazil Judge Withdraws $3.3 Million from Musk's Starlink and X to Pay for Social Media* Fines, AP NEWS (Sept 13. 2024), htttps://apnews.com/article/starling-supreme-court-brazil-afb5262691e02736deda08b8db752718
[18] Ben Derico & Ione Wells, *Brazil Lifts Ban on Musk's X After It Pays $5 Fine*, BBC (Oct. 8, 2024), https://www.bbc.com/news/articles/c5y06vzk3yjo.
[19] Gabriela Sa Pessoa, *Brazil's Top Court Justice Orders X to Pay $1.4 Million Fine for Non-Compliance Federal Court Justice Fines X $1.4M for Non-Compliance with Court Orders*, AP NEWS (Feb. 20, 2025), https://apnews.com/article/brazil-supreme-court-x-social-media-alexandre-de-moraes-free-speech-3df6deba4d34a6bbddfde77cbf5719b9.

reinforcing his established practice of using Brazil's judiciary to coerce U.S. companies into suppressing protected speech on U.S. soil.

49.    On March 19, 2025, Justice Moraes continued targeting American companies by issuing new directives targeting Meta Platforms, Inc. (Facebook) and X, ordering both to furnish the Brazilian Federal Police with personal account information of dos Santos, the same U.S. resident that is the target of the Gag Orders.[20]  The order to Meta and X mandates the production of private user data belonging to a U.S. person, without due process and in disregard of established legal channels.

50.    On March 18, 2025, Brazilian Congressman Eduardo Bolsonaro, the third son of former Brazilian President Jair Bolsonaro, announced that he would seek political asylum in the U.S. due to political persecution after it was widely reported that Justice Moraes was considering restricting the use of Eduardo's passport as part of a criminal investigation into his activities in the United States.[21]  Eduardo has long been an outspoken critic of Justice Moraes and an advocate for free speech and conservative causes in Brazil and abroad. In a public video posted to social media, Eduardo stated that he intended to

---

[20] Andrea Malcher, *Moraes Orders X and Meta to Hand Over Account Data From Allan dos Santos*, CNN (Mar. 19, 2025), https://www.cnnbrasil.com.br/politica/moraes-determina-que-x-e-meta-entreguem-dados-de-contas-de-allan-dos-santos/.
[21] Ana Ionova, *Son of Jair Bolsonaro Says He Will Seeks Political Asylum in the U.S.*, N .Y TIMES (Mar. 18, 2025), https://www.nytimes.com/2025/03/18/world/americas/jair-bolsonaro-son-us-asylum.html.

remain in the United States, citing efforts by Justice Moraes to seize his passport and potentially arrest him as retaliation for his public advocacy in the U.S. trying to raise awareness about censorship and political repression by Justice Moraes in Brazil.

51.    Eduardo has been residing in the United States since March 2025 where he has engaged with American lawmakers and civil society and has also publicly denounced Justice Moraes's abuses of power in social media. Eduardo's public remarks made clear his belief that Justice Moraes is weaponizing the judiciary to criminalize political dissent, and that such repression extends extraterritorially to target U.S.-based speech. "If Alexandre de Moraes wants to seize my passport or even arrest me so that I can no longer report his crimes in the United States, then this is precisely where I will stay and work harder than ever," Eduardo said.[22]

52.    On May 26, 2025, the Brazilian Attorney General, Paulo Gonet, requested that the STF open a criminal inquiry into Eduardo for his activities in the United States.[23] The criminal charges against Eduardo for his activities on American soil raising awareness of the ongoing abuses in Brazil include the crimes of coercion during judicial proceedings, obstruction of investigation, and

---

[22] *Id.*
[23] Marilia Marasciulo, *Brazil Supreme Court Opens Criminal Inquiry into Jair Bolsonaro's Son*, COURTHOUSE NEWS SERV. (May 27, 2025), https://www.courthousenews.com/brazil-supreme-court-opens-criminal-inquiry-into-jair-bolsonaros-son/.

"violent abolition of the democratic rule of law."  The criminal investigation
into Eduardo was assigned to the victim of his alleged crimes, Justice Moraes.[24]

53.    Despite the protected nature of Eduardo's activities under U.S.
law, Justice Moraes's authorization of a criminal investigation into these
actions represents an attempt to extend Brazilian judicial authority beyond its
borders to suppress political dissent and advocacy occurring within the United
States.

54.    Eduardo's case further illustrates a pattern of political repression
targeting U.S.-based persons and speech, as part of Justice Moraes's ongoing
campaign of censorship and judicial overreach.  He joins the growing list of
political dissidents, journalists, former judges, and American citizens who have
been targeted through sealed orders, account suspensions, asset freezes, and
politically motivated criminal charges by Justice Moraes.

55.    Justice Moraes's sweeping orders—backed by severe enforcement
mechanisms—systematically quash dissent, including U.S. based dissidents
and critics, under the broad pretexts of "fake news," "disinformation," or "anti-
democratic" speech.  On their face, the directives purport to safeguard electoral
integrity or protect democracy, yet in practice they target independent voices,
erase public debates, and wield daily fines or asset freezes to coerce

---

[24] *Id.*

compliance.  Such sealed proceedings and secret blacklists go far beyond mere content moderation, forming a deliberate, punitive campaign to eradicate legitimate dissent and solidify Justice Moraes's dominance over Brazil's public discourse.

56.    If Justice Moraes's actions were confined to Brazil, they would be regrettable, and likely not in the province of U.S. courts.  But many of Justice Moraes's actions, including the illegal Gag Orders challenged here, reach directly into the United States to compel action by U.S. companies having no presence in Brazil, and which will have the effect of suppressing speech not just in Brazil, but in the United States and throughout the world.

## IV.  The U.S. and Brazil Have Established Legal Channels to Serve and Enforce Judicial Orders That Justice Moraes Has Violated

57.    There are, of course, lawful means for a court in one country to serve its orders on a citizen and resident of another country.

58.    The United States and Brazil are parties to the Mutual Legal Assistance Treaty ("MLAT") in criminal matters, which entered into force on February 21, 2001.  The MLAT establishes clear procedures for the exchange of information, service of documents, and enforcement of orders in criminal investigations involving cross-border issues.  Among the tools available under the MLAT are provisions for serving documents (Article 13), obtaining testimony or evidence (Article 8), and conducting searches and seizures (Article

14), all of which must be channeled through the designated Central Authorities: the U.S. Department of Justice and Brazil's Ministry of Justice.

59.     In addition to the MLAT, Justice Moraes could have used the Hague Service Convention (to which both the United States and Brazil are signatories) or the traditional process of letters rogatory to lawfully serve and enforce his orders in the United States.   These mechanisms are well-established, internationally recognized, and adhere to the principles of sovereign consent.  The Hague Service Convention provides a streamlined framework for cross-border service of judicial documents.  Letters rogatory involve formal requests through diplomatic channels for judicial assistance, subject to the approval of the courts in the country where assistance is sought.

60.     These mechanisms are grounded in mutual respect for sovereignty and ensure that legal orders originating in one country are processed in a manner consistent with the laws and constitutional protections of the other. They preserve the integrity of international cooperation while respecting each country's sovereignty and preventing overreach by foreign judicial actors.

61.     As set forth below, Justice Moraes knowingly and intentionally circumvented each of these mechanisms in issuing the Gag Orders.

## V.     U.S. Law and Public Policy Oppose Censorship and Judicial Overreach

62.     The United States has long upheld free speech as a cornerstone

of its constitutional framework, enshrined in the First Amendment, and has consistently opposed censorship, particularly when imposed extraterritorially by foreign governments.

63.    Vice President JD Vance's speech at the Munich Security Conference on February 14, 2025, reaffirmed these principles as a critical component of U.S. public policy.  Speaking before a global audience, Vice President Vance articulated the U.S. commitment to defending free expression against judicial overreach and authoritarian measures cloaked under the guise of combating "misinformation" or "anti-democratic speech."[25]

64.    Vice President Vance explicitly condemned judicial censorship, stating, "we know very well in America that you cannot win a democratic mandate by censoring your opponents or putting them in jail, whether that's the leader of the opposition, a humble Christian praying in her own home, or a journalist trying to report the news."[26]  His remarks emphasized the incompatibility of true democratic governance with practices that suppress dissent, restrict lawful expression, or penalize opposition viewpoints.  He warned that such measures undermine not only domestic freedoms but also global confidence in democratic institutions.  These statements underscore a

---

[25] J.D. Vance, *Remarks by the Vice President at the Munich Security Conference*, THE AM. PRESIDENCY PROJECT (Feb. 14, 2025), https://www.presidency.ucsb.edu/documents/remarks-the-vice-president-the-munich-security-conference-0.
[26] *Id.*

U.S. policy framework that categorically rejects the enforcement of foreign censorship orders, such as those issued by Justice Moraes, on U.S.-based service providers like Rumble and platforms like Truth Social.

65.     The Vice President, in outlining U.S. policy, further noted that free speech is essential to a functioning democracy, even when it involves controversial or unpopular viewpoints.  He highlighted the dangers of delegitimizing lawful discourse through overbroad censorship mechanisms, warning that such actions erode the very principles they purport to protect. By asserting that "democracy rests on the sacred principle that the voice of the people matters," Vice President Vance underscored the need to resist extraterritorial dictates that seek to silence lawful speech within the United States.[27]

66.     The United States' longstanding opposition to foreign judicial overreach is further reinforced by Executive Order 14203, issued on February 6, 2025.  This order underscores the U.S. government's unequivocal commitment to protecting its citizens, entities, and allies from illegitimate foreign judicial actions.  Specifically targeting the International Criminal Court ("ICC"), the EO 14203 denounces attempts by the ICC to assert jurisdiction over U.S. or allied persons without U.S. consent, describing such

---

[27] *Id.*

actions as a direct affront to U.S. sovereignty and national security. EO 14203 establishes a U.S. policy framework that rejects foreign judicial attempts to impose their legal standards extraterritorially—standards that conflict with U.S. constitutional protections and established legal norms.

67.     In February 2025, the U.S. House Committee on the Judiciary issued subpoenas to several U.S.-based companies as part of an investigation into "the extent and nature of … foreign censorship efforts and their effect on constitutionally protected speech at home."[28]  The Committee observed that "foreign governments have taken increasingly aggressive actions to suppress disfavored views on social media by regulating content" in recent years. As one illustrative example, the Committee cited Justice Moraes, who "has issued secret, lawless orders forcing American companies to remove large amounts of content or face fines and be banned from the country." To assess the scope and impact of such foreign influence, the Committee sought documents concerning companies' compliance with foreign censorship laws, regulations, judicial orders, or other government-initiated efforts.

68.     On May 21, 2025, during a hearing before the U.S. House Committee on Foreign Affairs, Secretary of State Marco Rubio responded to a question regarding the potential for U.S. sanctions against Justice Moraes for

---

[28] Letter from Jim Jordan, Chairman, H. Comm. On the Judiciary, to Mark Zuckerberg, Chief Exec. Officer, Meta Platforms, Inc. (Feb. 26, 2025), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2025-02-26-jdj-to-zuckerberg-meta-re-subpoena.pdf.

his "pervasive censorship" under the Global Magnitsky Act.[29]  Secretary Rubio stated "[t]hat [sanction] is under review now, and it's a great possibility that will happen."[30]

69.    On May 28, 2025, Secretary Rubio announced that the United States would impose visa restrictions on foreign officials responsible for censoring protected expression within the United States.  In making the announcement, Secretary Rubio cited Latin America as a region where such censorship efforts have been particularly concerning.

## VI.    The Department of Justice Informed Moraes That His Orders as to Rumble Are Unlawful

70.    On May 29, 2025, it was publicly reported that the U.S. Department of Justice ("DOJ") sent a letter to Justice Moraes admonishing him for ordering Rumble to block the user accounts of a U.S. user without notifying and obtaining the consent of the U.S. government.[31]

71.    The May 7, 2025, letter from the DOJ's Office of International

---

[29] The Global Magnitsky Human Rights Accountability Act, 22 U.S.C. § 2656, authorizes the U.S. government to impose sanctions on foreign persons—including government officials—responsible for gross human rights violations or significant acts of corruption. Sanctions may include asset blocking and visa restrictions. The statute allows for designation based on conduct that occurs extraterritorially, including acts that undermine freedoms protected by U.S. law.

[30] Cristian Agostine, *Marco Rubio Says U.S. Sanctions Against Justice Moraes "A Great Possibility"*, VALOR INT'L (May 22, 2025), https://valorinternational.globo.com/foreign-affairs/news/2025/05/22/marco-rubio-says-us-sanctions-against-justice-moraes-a-great-possibility.ghtml.

[31] Jack Nicas, *Trump Administration Targets Brazilian Judge for 'Censorship'*, THE N.Y TIMES (May 29, 2025), https://www.nytimes.com/2025/05/29/world/americas/trump-brazil-judge-censorship.html.

Judicial Assistance delivers a clear and formal rebuke of Justice Moraes's
attempts to compel Rumble to take action in the United States without legal
authority or coordination with the U.S. government.  Addressed directly to
Justice Moraes and copied to the Brazilian Ministry of Justice, the letter
analyzes the Gag Orders issued by Justice Moraes, including directives to
block user accounts, suspend payments, and disclose financial information,
all pertaining to an identified U.S.-based individual.[32]

72.     Citing the Restatement (Fourth) of Foreign Relations Law and
longstanding U.S. jurisprudence, the DOJ confirms that "a state may not
exercise jurisdiction to enforce in the territory of another state without the
consent of the other state."  The letter emphasizes that enforcing a foreign
judicial order within the United States would generally require initiation of a
U.S. court proceeding and compliance with applicable U.S. law and procedural
safeguards.

73.     The DOJ also expresses concern regarding the improper service
of process, stating that Justice Moraes's attempts to direct Rumble to act in
the United States must occur through "an appropriate channel, consistent
with customary international law and any applicable agreements between

---

[32] *U.S. Letter to Moraes: Brazilian Orders Are Not Valid*, CNN BRASIL (May 30, 2025),
https://www.cnnbrasil.com.br/blogs/caio-junqueira/politica/carta-dos-eua-a-moraes-ordens-
brasileiras-nao-valem-leia-integra/.

Brazil and the United States."[33]  The letter explains that such service must comply with the Hague Service Convention or the Brazil-U.S. MLAT, and reiterates that failure to follow these procedures invalidates any attempt to compel compliance from U.S. entities.

74.    The DOJ concludes by clarifying that it will not recognize or enforce coercive measures, including monetary penalties, that are imposed by foreign courts on non-party U.S. persons for failure to comply with such extraterritorial orders.   The letter further notes that any request for information from Rumble should have been submitted through proper diplomatic and legal channels, underscoring that Justice Moraes's conduct bypassed legal channels entirely.

## VII.  Justice Moraes's Judicial Overreach Targets Rumble on American Soil

75.    Dos Santos is a U.S.-based conservative Brazilian commentator and blogger, known for founding media outlets critical of the STF.  He built a sizable online following by advocating for free-speech principles and voicing strong support for former Brazilian President Bolsonaro's administration. This included a YouTube channel with over 1.3 million followers.

76.    Over time, dos Santos's reporting and commentary clashed with Justice Moraes's views, which he criticized as overreaching and politically

---

[33] *Id.*

biased.  As a result, Justice Moraes began attacking dos Santos through censorship orders and criminal investigations into his allegedly "anti-democratic" speech.  In 2021, dos Santos fled Brazil after Justice Moraes issued a warrant for his arrest for the crime of "spreading misinformation" and "criticizing the Supreme Court," activities that are, of course, considered First Amendment-protected free speech in the United States.  Dos Santos sought political asylum in the United States, where he remains.

77.    In March 2024, the United States rejected Brazil's request to extradite dos Santos, an exiled journalist now living in the United States, determining that the charges against him were "crimes of opinion" protected under the First Amendment and did not qualify as extraditable offenses under the U.S.-Brazil MLAT, and thus that there were no valid grounds for extradition.

78.    In February 2025, Justice Moraes issued sealed Gag Orders commanding Rumble to block the accounts of dos Santos within two hours and to "not . . . authorize the creation of a new channel/profile/account" or otherwise face a daily penalty of R $50,000 (almost US $9,000) and required "the immediate suspension of the transfer of  amounts arising from monetization, of the services used for donations, of the payment of advertisements and the registration of supporters, and arising from monetization originating from livestreams, including those carried out

32

through the provision of transmission keys to the aforementioned channels/profiles." They also require Rumble to disclose to the STF "all transfers made up to the date of receipt of the court order."

79.    The Gag Orders vaguely assert that dos Santos is using online video platform service providers and networks "as true protective shields for the practice of illegal activities, giving the investigated a true clause of criminal indemnity for the commission of crimes already indicated by the Federal Police." The alleged crime is "showing no restriction in propagating his criminal speeches." The orders do not identify any "criminal" speech.

80.    On February 21, 2025, Justice Moraes ordered the complete suspension of Rumble in Brazil, the payment of fines, and the designation of a legal representative in Brazil. That order also threatened Rumble's CEO, who resides in the United States, with criminal prosecution merely for posting on X that "We received another illegal and confidential order last night, requiring us to comply by tomorrow night. You don't have authority over Rumble here in the U.S. unless you go through the U.S. government. I repeat - I'll see you in court." As of today's date, Rumble and Truth Social's operability has been affected by this order, including in Brazil.

81.    The Gag Orders do not limit their scope to Brazilian audiences; they impose a complete ban on dos Santos's content, regardless of geographic reach or the lawful nature of the commentary under American free-speech

standards.  The Gag Orders demand that Rumble, from its Florida-based headquarters and without any Brazil operations, enforce a universal ban on the targeted accounts—imposing a total blackout that extends even to U.S. users.  This is not merely a takedown of specific content, but an across-the-board prohibition on any speech, backed by escalating daily fines and a forced shutdown of Rumble's online video-sharing and cloud-hosting services.  The risk of a Rumble shutdown beyond Brazil's borders is heightened by Justice Moraes's known practice of ordering tech giants (like Google and Apple) to take actions to enforce his orders, such as removing noncompliant apps from their stores under the same punishing penalties.

82.    The Gag Orders also require Rumble, a U.S.-based company with no presence or operations in Brazil, to appoint local attorneys in Brazil solely for the purpose of accepting service of Justice Moraes's censorship mandates (and the corresponding penalties), and to otherwise fall under the authority of Justice Moraes.

83.    This extraterritorial censorship thus exerts a direct, tangible impact on both Rumble and TMTG.  Rumble—with its headquarters, key physical servers, and technical infrastructure located on American soil—is subject to crushing fines or an outright ban if it defies Justice Moraes's Gag Orders.  The stakes are magnified by the possibility that Justice Moraes may pressure Google or Apple to remove the Rumble app from their app stores

entirely, effectively banning it from U.S. devices, as well as pressuring other
third service telecom providers to shut down Rumble.  As a result, Truth
Social—which depends, in part, on Rumble's technology—risks operational
challenges in the United States.

84.    Because Truth Social relies on Rumble's back-end services—
including cloud hosting, user logins, and video streaming—these
extraterritorial demands threaten to erase lawful American speech and
disrupt Truth Social's core functionality within the United States.  Should
Rumble be forced into compliance—or face broad, unspecified expulsion from
the Brazilian market and elsewhere pursuant to orders from Justice Moraes—
Truth Social would endure challenges to its ability to publish and share
content.

85.    These directives, issued through sealed proceedings in Brazil,
impermissibly extend Brazilian judicial power into lawful U.S. activities—
upending Rumble's and TMTG's ability to deliver First-Amendment protected
content domestically.  Should companies like Google or Apple comply with
Justice Moraes's extraterritorial demands, the shutdown could intensify,
depriving American service providers like Rumble and platforms like Truth
Social of lawful expression and shutting off millions of U.S. users from robust
political debate.

86.    Justice Moraes knew or should have known about Rumble's and

TMTG's (via Truth Social) contractual and business relationships, given the
public nature of Rumble, TMTG, and Truth Social, and specifically targeted
measures that interfered with Rumble's infrastructure and operations that
Truth Social relies on.  His directives effectively force or attempt to force
Rumble and TMTG (via Truth Social) to suspend or restrict user accounts in
ways that conflict with the Rumble Terms of Use and Truth Social's Terms of
Service.  Rumble and TMTG (via Truth Social) have suffered damages and
harm from the loss of user engagement and monetization opportunities
resulting from Justice Moraes's interference with these contractual and
prospective business relationships.

## IX.    The Gag Orders Are *Ultra Vires* Acts

87.    Justice Moraes's *ultra vires* actions to bypass the MLAT, the
Hague Service Convention, and the traditional letters rogatory process were
not accidental or inadvertent but deliberate and calculated.  Justice Moraes
is a highly sophisticated jurist who has used these legal mechanisms dozens
of times.    These mechanisms provide well-established, internationally
recognized frameworks for addressing cross-border legal matters, ensuring
that requests from foreign judicial authorities are reviewed for compliance
with the laws and constitutional protections of the receiving nation.  By
intentionally circumventing all three frameworks, Justice Moraes
demonstrated a clear understanding that his overbroad, vague, and

extraterritorial demands would not survive scrutiny under any lawful process.

88.    Under the MLAT, any request for document service, testimony, or enforcement must be routed through the designated Central Authorities of both nations: the U.S. Department of Justice and Brazil's Ministry of Justice. This process is specifically designed to uphold principles of sovereignty and comity, requiring that each nation evaluate whether the request aligns with its domestic laws and public policy.

89.    Recognizing that his demands would likely fail under the MLAT's rigorous review process, Justice Moraes devised a coercive strategy to bypass the treaty entirely.  Rather than submitting a formal request through the proper channels, Justice Moraes issued orders compelling Rumble, a U.S.-based company with no presence or operations in Brazil, to appoint local attorneys in Brazil solely for the purpose of accepting service of his censorship mandates.  This maneuver not only contravenes the procedural requirements of the MLAT but also fabricates jurisdiction through coercion, violating the treaty's core principles and undermining the integrity of international legal cooperation.  Coercion is certainly the right word.  For example, when X originally defied Justice Moraes's censorship orders, he threatened to have X's legal representatives there arrested, resulting in X evacuating its Brazilian staff from the country.

90.    The Hague Service Convention, to which both Brazil and the
United States are signatories, provides an alternative, streamlined
framework for cross-border service of judicial and extrajudicial documents.
This treaty ensures that legal requests are processed in a manner consistent
with the sovereignty of the receiving country while protecting individuals and
entities from improper or unauthorized foreign judicial orders.    By
circumventing the Hague Service Convention, Justice Moraes further
demonstrated his disregard for established international rules and norms.
The Convention's procedural safeguards would have required Brazilian
authorities to submit service requests through U.S. authorities, ensuring
oversight and compliance with domestic laws, including constitutional
protections.  Justice Moraes ignored these safeguards entirely, opting instead
for a unilateral approach that imposed his will on a U.S. company without
regard for proper legal processes or sovereignty.

91.    Additionally, Justice Moraes disregarded the traditional process
of letters rogatory, which offers a formal diplomatic channel for requesting
judicial assistance between countries.  Letters rogatory are subject to judicial
review in the receiving country, ensuring that any request complies with local
laws and respects the rights of the targeted entity.  This process provides
critical safeguards against overreach, as it requires approval from U.S. courts
before any foreign order can be enforced.  Justice Moraes's decision to sidestep

this process highlights his intent to avoid the scrutiny of U.S. courts, knowing that his overbroad and extraterritorial demands would likely be deemed incompatible with U.S. law and public policy.

92.    By bypassing the MLAT, the Hague Service Convention, and the letters rogatory process, Justice Moraes deliberately ignored the established mechanisms of international legal cooperation.  These frameworks exist to balance the legitimate interests of sovereign states while safeguarding against the imposition of foreign legal standards that conflict with domestic laws.   Justice Moraes's actions disrupt this balance, unilaterally and unlawfully extending Brazilian judicial authority into the United States without the consent or oversight of U.S. authorities.  Such conduct not only disregards the sovereignty of the United States but also sets a dangerous precedent, undermining trust in the legal processes designed to facilitate lawful and respectful international cooperation.

93.    Justice Moraes's coercive tactics—including forcing Rumble to appoint Brazilian attorneys under the threat of shutdown and imposing substantial fines—further exacerbate the violation of these mechanisms.  His actions reveal a calculated effort to fabricate jurisdiction and enforce Brazilian law extraterritorially, in clear contravention of the principles of comity and mutual respect that underpin international law. Justice Moraes's issuance of the Gag Orders is far outside the scope of his legitimate and lawful

authority as a Justice of the STF.

## X.    Justice Moraes's Actions Violate U.S. Public Policy

94.    Justice Moraes's Gag Orders represent precisely the type of infringement on free expression that the United States has consistently rejected as incompatible with its constitutional order.  When Justice Moraes formally requested the extradition of dos Santos, the United States reportedly declined in 2024 on the grounds that the conduct alleged—criticism of public officials and institutions—was not illegal in the U.S.  Justice Moraes's efforts to use Brazil's judiciary to silence political speech occurring in the United States, including through *ex parte* and sealed orders, vague allegations of "anti-democratic speech," and the imposition of coercive fines, directly contravene established U.S. public policy.

95.    The DOJ has confirmed that Justice Moraes's orders violate international legal norms, bypass U.S. legal process, and fail to comply with either the MLAT or the Hague Service Convention.  The DOJ letter emphasized that enforcement of foreign judicial orders on U.S. soil without adherence to U.S. law and due process is impermissible.  This formal admonition by the U.S. government reinforces that Justice Moraes's conduct is inconsistent with U.S. public policy.

96.    Further underscoring that the actions of Justice Moraes are contrary to U.S. public policy is Secretary Rubio's testimony before the U.S.

House Committee on Foreign Affairs that the U.S. government is considering
sanctions on Justice Moraes.

97.    Justice Moraes's extrajudicial tactics are also in direct conflict
with U.S. public policy, as articulated in EO 14203, issued by President
Trump in February 2025.  The EO opposes foreign judicial overreach that
seeks to impose jurisdiction on U.S. entities without consent.  By coercing
Rumble into appointing Brazilian attorneys and threatening punitive actions
if it does not comply, Justice Moraes's actions mirror the type of
extraterritorial conduct condemned by the EO.  His orders also aim to bypass
both the prior determination of the U.S. government and the checks and
balances that the MLAT and related mechanisms provide, threatening the
sovereignty of U.S. law and undermining international cooperation.

98.    The parallels between the ICC's actions condemned in EO 14203
and the conduct of Justice Moraes are striking.  Both involve foreign judicial
actors purporting to assert extraterritorial jurisdiction over individuals and
entities beyond their legitimate reach or without U.S. consent.   Just as EO
14203 describes ICC investigations and arrest warrants targeting U.S.
citizens as illegitimate and threatening to sovereignty, Justice Moraes's Gag
Orders seek to impose Brazilian censorship laws on U.S.-based companies,
infringing on constitutionally protected speech and operating outside the
permissible bounds of judicial authority.

99.    EO 14203 explicitly highlights the dangers of foreign judicial actions that impose undue restrictions or penalties on U.S. individuals and entities without due process or jurisdictional authority.  Justice Moraes's orders follow the same pattern of overreach: targeting U.S.-based companies like Rumble and TMTG. These orders demand the removal of lawful content—content that does not violate U.S. law.  Like the ICC actions described in the EO, Justice Moraes's actions disregard the sovereignty of the United States by bypassing the legal channels that are appropriate to serve and enforce such orders, unilaterally applying foreign legal orders to American entities and activities that are fully compliant with U.S. law.

100.    The EO further emphasizes that foreign judicial overreach is not merely a procedural issue but a substantive threat to the United States.  By seeking to impose foreign censorship laws on an American company, Justice Moraes's actions mirror the ICC's attempts to prosecute U.S. citizens for conduct outside the ICC's jurisdiction.

101.    Furthermore, EO 14203 highlights the mechanisms of foreign judicial overreach that align with Justice Moraes's methods.   The EO condemns ICC actions that expose individuals to "harassment, abuse, and possible arrest" without legal basis.  Similarly, the Gag Orders impose ruinous daily fines and threaten to shut down U.S. based companies if they do not comply with his extraterritorial censorship demands.

42

102. The EO targets actions that interfere with lawful conduct under U.S. law. Justice Moraes's Gag Orders compel the removal of lawful U.S. speech that is fully protected under the First Amendment and shielded by statutory immunities such as the CDA.

103. EO 14203 explicitly rejects the ICC's efforts to claim jurisdiction over non-consenting states or their citizens, emphasizing the principle that sovereignty cannot be undermined by unilateral judicial actions. Similarly, Justice Moraes's actions represent an illegitimate extension of Brazilian judicial power into the United States, targeting U.S.-based companies and their global operations by bypassing lawful channels.

104. EO 14203 warns of the precedent set when international or foreign courts claim authority over nations that have not consented to their jurisdiction. Justice Moraes's actions, if left unchecked, would create a dangerous precedent whereby foreign courts could routinely impose their laws on U.S. companies if they chose to bypass legally established channels, threatening the foundational principles of U.S. sovereignty, free expression, and open discourse.

105. Lastly, EO 14203's provisions impose tangible consequences on foreign actors who engage in overreach and provide a policy framework for rejecting the enforceability of Justice Moraes's Gag Orders. The EO authorizes sanctions, asset freezes, and travel bans against ICC officials

responsible for such conduct, signaling that the United States views these actions as not only illegitimate but actionable. While this complaint does not seek similar measures, the principles articulated in the EO reinforce the Plaintiffs' argument that Justice Moraes's orders are repugnant to U.S. public policy and must be declared unenforceable within the United States.

106. These developments confirm what Plaintiffs have consistently alleged: Justice Moraes's orders are fundamentally incompatible with U.S. law, foreign policy, and constitutional principles. His campaign of sealed censorship, extraterritorial coercion, and retaliatory punishment directed at U.S.-based entities and individuals offends public policy to the point of inviting formal diplomatic consequences.

107. In short, Rumble and TMTG stand firm on upholding American free-speech rights over censorship, particularly that demanded by a foreign judiciary. Justice Moraes cannot dictate the contours of lawful discourse within the United States. Only American law—rooted in the First Amendment—should regulate and govern these U.S.-based companies and their American operations.

108. Plaintiffs respectfully submit that this Court reject the enforceability of Justice Moraes's orders on the grounds that they were issued and attempted to be enforced in violation of established legal mechanisms, in breach of U.S. sovereignty, in violation of U.S. laws, and in a manner

incompatible with U.S. public policy.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## U.S. Const. Amend. I; Declaratory Judgment Act (28 U.S.C. § 2201)

109.    Plaintiffs repeat and incorporate by reference their allegations contained in paragraphs 1–108 of this Amended Complaint.

110.    The First Amendment of the U.S. Constitution forbids government abridgement of lawful free expression, including judicial restraints that force U.S.-based online service providers and platforms—such as Rumble and Truth Social—to remove user-generated content that does not violate American law.

111.    The Gag Orders compel the suspension of the Banned Accounts on Rumble, precluding the availability of that content in the United States.

112.    Additionally, the Gag Orders cease Rumble's operations in Brazil. Upon information and belief, to enforce this shutdown if Rumble refuses, Justice Moraes will seek to compel third parties, such as telecommunications providers, the Google Play Store, or the Apple App Store, to block access to Rumble's services.

113.    Because Rumble's infrastructure system is globally integrated, a forced shutdown in Brazil would hinder Rumble's ability to fully serve U.S. users as well, disrupting lawful speech.

114.   Because TMTG relies, in part, on Rumble's infrastructure for Truth Social's functionality, any account suspension or forced shutdown of Rumble in Brazil would likely impact Truth Social's full functionality and prevent Truth Social accounts from fully displaying their content to users in the United States.

115.   Judicial restraints aimed at specific speakers or content trigger strict scrutiny.

116.   The Gag Orders are directed to a specific speaker, dos Santos, and are content-specific, therefore subject to strict scrutiny.

117.   Enforcing the Gag Orders in the United States would violate the First Amendment.   The Gag Orders further no compelling interest or substantial interest, and they are not narrowly tailored to achieve one. Justice Moraes cannot show that he has no alternatives available other than enjoining the Banned Accounts outside of the United States.

118.   Actions taken to impact service providers like Rumble and platforms like Truth Social or the suspension of the Banned Accounts irreparably harms Rumble and TMTG, as it chills protected speech and erodes user trust.   Such injuries cannot be remedied by monetary damages alone, as lost opportunities for discourse and reputational harm endure even after the shutdowns or the account suspensions.

119.   Plaintiffs are therefore entitled to a declaratory judgment that

the Gag Orders are unenforceable in the United States on the ground that enforcement of the orders would violate the First Amendment.

## SECOND CAUSE OF ACTION

### Communications Decency Act, 47 U.S.C. § 230; Declaratory Judgment Act, 28 U.S.C. § 2201

120.  Plaintiffs repeat and incorporate by reference their allegations contained in paragraphs 1–108 of this Amended Complaint.

121.  Under 47 U.S.C. § 230(e)(3), "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  In other words, providers of interactive computer services are immunized for content on their services created by others.

122.  Rumble operates a video-hosting and cloud-based infrastructure through which users post and share their own content, qualifying as an "interactive computer service" provider under Section 230(e)(3).  TMTG provides a social media platform—Truth Social—which hosts user-generated posts and relies, in part, on Rumble's services for functionality.

123.  Justice Moraes has issued Orders requiring Rumble—under the threat of daily fines and a potential shut-down—to suspend the Banned Accounts.  This directive directly impacts Truth Social because TMTG's video features and functionality depend, in part, on Rumble's infrastructure.

124.   The Gag Orders do not allege that the targeted content violates U.S. law.   Nor do they claim it involves U.S. intellectual property infringement, U.S. federal criminal acts, or sex trafficking, the statutory exceptions under 47 U.S.C. § 230(e).   The Gag Orders instead rely on broad, foreign "criminal speech" designations that do not align with Section 230's bar on holding companies like Rumble and TMTG liable for user-created content that is lawful in the United States.

125.   Under 47 U.S.C. § 230(e)(3), no state, local, or foreign law may impose liability or enforcement mechanisms that conflict with the CDA's protections.   The Gag Orders compel the suspension of the Banned Accounts and block entire categories of political speech.   Such forced compliance is inconsistent with Section 230's immunity framework and thus preempted by federal law.

126.   Because TMTG's application Truth Social relies, in part, on Rumble's infrastructure, compelled suspension of Rumble deprives Truth Social users of full access to lawful speech in the United States.

127.   Rumble and TMTG face either forced unlawful censorship in the United States or incurred fines and forced shutdown.   This conflict imposes irreparable harm on Rumble and TMTG.

128.   Plaintiffs are therefore entitled to a declaratory judgment that the Gag Orders are unenforceable in the United States on the ground that

enforcement of the orders would violate the Communications Decency Act.

## THIRD CAUSE OF ACTION

### Enforcement Trespasses on Comity; Declaratory Judgment Act
### (28 U.S.C. § 2201)

129.    Plaintiffs repeat and incorporate by reference their allegations contained in paragraphs 1–108 of this Amended Complaint.

130.    Foreign courts should not exercise extraterritorial enforcement jurisdiction over lawful American speech and conduct, as each country is master of its own territory.    Foreign injunctions that attempt to control expression on U.S. soil exceed legitimate comity limits.

131.    A foreign order is unenforceable if it is "repugnant to the public policy of this state or of the United States."

132.    By compelling Rumble, and therefore TMTG, to censor user-generated content that does not violate U.S. law, the Gag Orders conflict with basic First Amendment protections and disregard Section 230's safeguards, rendering them repugnant to U.S. public policy on international comity grounds.    And by compelling Rumble to appoint a legal representative in Brazil for the purposes of submitting to Justice Moraes's authority, the Gag Orders attempt to circumvent the U.S.-Brazil MLAT, the Hague Convention on Service, and the letters rogatory process—all in contravention of principles of international comity and sovereignty.

133.   Justice Moraes's extraterritorial demands inflict immediate and irreparable harm on Rumble and TMTG by undermining lawful American political discourse, a right central to free speech under U.S. principles, and disregarding Rumble's and TMTG's Section 230 immunities, which are integral to their operational structure and user trust.  This damage cannot be remedied by monetary compensation, as lost user confidence and chilled free expression cause lasting detriment to Rumble's and TMTG's services and reputations.

134.   Plaintiffs are therefore entitled to a declaratory judgment that the Gag Orders are unenforceable in the United States on the ground that enforcement of the orders would be repugnant to the public policy of the United States.

## **FOURTH CAUSE OF ACTION**

### **Stored Communications Act, 28 U.S.C. §§ 2701–2713; Declaratory Judgment Act, 28 U.S.C. § 2201 (Plaintiff Rumble)**

135.   Plaintiff Rumble repeats and incorporates by reference its allegations contained in paragraphs 1–108 of this Amended Complaint.

136.   The Stored Communications Act, 18 U.S.C. §§ 2701–2713, protects the privacy of users like dos Santos by limiting the circumstances under which providers of remote computing services may disclose user records or other information pertaining to a subscriber or customer.   18 U.S.C. §

2702(a)(3).

137.   The SCA defines a "remote computing service" ("RCS") as "the provision to the public of computer storage or processing services by means of an electronic communications system."  18 U.S.C. § 2711(2).  Rumble qualifies as an "RCS" because it provides cloud-based hosting and processing of user-generated content and related data.

138.   The Gag Orders require Rumble to divulge user records or other information regarding dos Santos without satisfying any of the SCA's enumerated exceptions.  The Gag Orders were not issued by a qualifying "government entity," 18 U.S.C. § 2702(c)(1), (4), because they are from a foreign judge, not a "department or agency of the United States or any State or political subdivision thereof," *id*. § 2711(4).  *See also* 18 U.S.C. § 2703(a)(c) (same analysis).  They also were not issued pursuant to any lawful processes for international service of an order, such as the MLAT, the Hague Convention on Service, or the letters rogatory process.  *Id*. § 2702(c)(7).  Additionally, no user consent has been presented that would authorize disclosure under 28 U.S.C. § 2702(c)(2).

139.   By compelling Rumble to disclose subscriber information in a manner that violates the SCA, the Gag Orders conflict with and are preempted by federal law.  Rumble cannot comply with these demands without exposing itself to potential liability for unlawful disclosure under the

SCA.

140.   The Gag Orders therefore place Rumble in an impossible position of having to either violate the Gag Orders and endure escalating daily fines and a shutdown or comply and risk liability under the SCA in the United States.  Such coercion constitutes irreparable harm.

141.   An actual controversy exists under 28 U.S.C. § 2201 because Plaintiffs seek a judicial declaration that the Gag Orders are unenforceable to the extent they require Rumble to violate the SCA by making impermissible disclosures of user information.

## FIFTH CAUSE OF ACTION

### Declaratory Relief Under Florida's Statutory Foreign Judgment Nonrecognition Policy

142.   Plaintiffs repeat and incorporate by reference their allegations contained in paragraphs 1–108 of this Amended Complaint.

143.   Florida law incorporates principles analogous to the Uniform Foreign-Country Money Judgments Recognition Act (codified at Fla. Stat. §§ 55.601–55.607).   While these provisions primarily concern "money judgments," Florida courts have recognized the broader public-policy rationale of refusing to enforce or recognize foreign judgments or orders that are repugnant to the public policy of Florida or the United States.

144.   The Gag Orders constitute foreign commands that require

extraterritorial censorship on U.S. soil, contradicting core free-speech protections enshrined in the U.S. Constitution; impose daily fines or the threat of total shutdown on U.S.-based businesses (Rumble and TMTG) in a manner contrary to 47 U.S.C. § 230 and Florida's strong policy favoring open discourse and minimal interference with lawful speech; and are thus "repugnant" to Florida and U.S. public policy under well-established principles of comity and Florida's nonrecognition framework.

145.   An actual controversy exists regarding whether these Gag Orders can be recognized or enforced within Florida or anywhere else in the United States.  Plaintiffs request a judicial declaration that:

    a. The Gag Orders are unenforceable and nonrecognizable under Florida's nonrecognition statutes and principles of public policy; and

    b. No Florida court or other authority may give legal effect to these or similar foreign orders that require extraterritorial censorship in violation of domestic free-speech protections and statutory immunities.

146.   Plaintiffs have no adequate remedy at law to protect their First Amendment and statutory rights, as well as their ongoing business relationships, if these Orders are recognized.  Absent declaratory relief, Plaintiffs face imminent and continuing harm to their business, reputation,

and users' lawful speech.

147.  Plaintiffs respectfully request that the Court declare the Gag Orders unenforceable and nonrecognizable under Florida law and grant such additional relief as the Court deems just and proper, including all forms of injunctive relief necessary to protect Plaintiffs from further harm or uncertainty.

## SIXTH CAUSE OF ACTION

### Tortious Interference with Contractual and Prospective Business Relations (Plaintiff Rumble)

148.  Plaintiff Rumble repeats and incorporates by reference its allegations contained in paragraphs 1–108 of this Amended Complaint.

149.  Rumble has valid and enforceable contracts with its users through its Terms of Use. The contract offers Rumble's video-sharing under specified terms.  Users affirmatively assent to the Terms of Use upon creating a Rumble account.   Rumble provides video-sharing services and other features, while users provide content and traffic that generate monetization for Rumble.   Both Rumble and users operate under and perform their respective obligations pursuant to the Terms of Use. Only Rumble reserves the right to suspend or terminate user access to Rumble's services.

150.   Rumble also has a valid and enforceable contract with TMTG through the Cloud Services Agreement. Under this agreement, Rumble

supplies cloud-hosting and video-streaming services, while TMTG pays fees and relies on Rumble's infrastructure for Truth Social's reliable operation.

151.  In addition to these existing contracts, Rumble maintains advantageous business relationships and legitimate economic expectancies with current and potential users.  These relationships are grounded in ongoing user growth and brand recognition that translate into concrete financial benefits for Rumble.

152.  Justice Moraes had actual or constructive knowledge of Rumble's contractual and business relationships, as demonstrated by the nature of the Gag Orders specifically targeting Rumble's platform.  By singling out Rumble to suspend or block content or user accounts, Justice Moraes knew or reasonably should have known that Rumble had contractual obligations to its users, including dos Santos, and TMTG, and that Rumble relied on these business relationships.

153.  Justice Moraes wrongfully, and without justification or privilege, intentionally interfered with Rumble's aforementioned existing contracts and prospective business relationships, including through the issuance of Gag Orders targeting Rumble's platform demanding the suspension and prohibiting the creation of accounts, requiring Rumble to turn over protected account-holder information, and compelling shutdowns of Rumble, and other conduct described herein that interfered with Rumble's existing or

prospective legal rights given it under its contracts with its users and TMTG. The Gag Orders suspend Rumble in Brazil and impose daily fines for noncompliance with the worldwide Gag Orders, coercing Rumble to act contrary to its contractual duties and undermining its ongoing and prospective business relations.

154.  Justice Moraes's *ultra vires* acts were not for any business purpose and therefore cannot constitute legitimate competition.  He personally threatened Rumble's Chief Executive Officer with criminal prosecution for lawful expression and for failing to comply with his Gag Orders, demonstrating malice and hostility.  Justice Moraes's behavior underscores an improper intent to force Rumble to breach its obligations and disrupt its relationships with third parties.

155.  As a direct and proximate result of Justice Moraes's conduct, Rumble has suffered and continues to suffer substantial damages and harm in the State of Florida and throughout the United States, including harm to Rumble's reputation and goodwill, lost users and engagement, adverse effects on Rumble's ability to perform under its user Terms of Use and its Cloud Services Agreement with TMTG, lost prospective advertisers and strategic partners, and other monetary losses to be determined at trial.

## SEVENTH CAUSE OF ACTION

**Tortious Interference with Contractual and Prospective Business Relations
(Plaintiff TMTG)**

156.  Plaintiff TMTG repeats and incorporates by reference its allegations contained in paragraphs 1–108 of this Amended Complaint.

157.  TMTG, through Truth Social, has valid and enforceable contracts with its Truth Social users through the Terms of Service, which provides users with a social media platform and features upon specified terms.  Users affirmatively agree to the Terms of Service when registering for a Truth Social account.  TMTG, through Truth Social, provides profile creation, content sharing, and account services, while users supply engagement, user-generated content, and advertising revenue.  Both parties demonstrate their intent to be bound and perform under the Terms of Service.

158.  TMTG also has a valid, binding Cloud Services Agreement with Rumble, under which Rumble provides infrastructure and streaming services, in exchange for TMTG's payment of fees.  TMTG's relies, in part, on Rumble's infrastructure system for platform functionality.

159.  Beyond these contracts, TMTG maintains vital business relationships and prospective economic opportunities with advertisers, technology collaborators, and current or potential Truth Social users.  Because TMTG's Truth Social platform is growing, these relationships

represent a definite business expectancy with concrete prospects for user expansion, user engagement, and monetization.

160.   Justice Moraes was aware or should have been aware of TMTG's contractual and business relationships.   He specifically targeted Rumble's hosting services for TMTG's Truth Social platform via the Gag Orders, forcing a shutdown of Rumble and reflecting knowledge that TMTG and other companies rely on Rumble's cloud-support and video-streaming services for continued user engagement under the Terms of Service.   The nature of the directives further indicates Justice Moraes was aware that the success of the Truth Social platform hinges, in part, on uninterrupted operation and user participation.

161.   Justice Moraes's issuance of the Gag Orders wrongfully, and without justification or privilege, intentionally interfered with TMTG's performance under the user Terms of Service, the Cloud Services Agreement, and with its existing or prospective business relations.   By mandating the shutdown of Rumble, forcing Rumble to block certain of Truth Social's service capabilities, Justice Moraes improperly hindered TMTG's contractual arrangement with Rumble, and disrupted TMTG's business model reliant, in part, on unhindered user participation and content exchange.

162.  Justice Moraes's *ultra vires* actions were not for any business purpose and therefore cannot constitute legitimate competition.    He

personally threatened Rumble's Chief Executive Officer with criminal prosecution for lawful expression on X and for failing to comply with his Gag Orders, demonstrating malice and hostility. Justice Moraes's behavior underscores an improper intent to disrupt relationships between and among both Plaintiffs and third parties, including their users.

163. As a direct and proximate result of Justice Moraes's acts, TMTG has sustained and will continue to sustain damages and harm in the State of Florida and throughout the United States, including reduced platform engagement, adverse effects on TMTG's standing with advertisers and potential partners, disruption of the Cloud Services Agreement, and monetary losses in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Rumble and TMTG pray for judgment against Justice Moraes as follows:

1. Declare that the Gag Orders are unenforceable in the United States as inconsistent with the First Amendment, the Communications Decency Act, the Stored Communications Act, Florida law, and U.S. and Florida public policy;

2. Issue judgment in Rumble's and TMTG's favor and against Justice Moraes on all causes of action alleged herein;

3. Grant Rumble and TMTG injunctive relief enjoining enforcement

of the Gag Orders in the United States;

4.    Enjoin Justice Moraes from compelling any third party—such as Apple, Google, and any persons or entities acting at their direction—to remove or delist, or threaten to remove or delist, the "Rumble" application or any other applications from their respective app stores in the United States to the extent such action is taken in compliance with, or for the purpose of enforcing, the Gag Orders;

5.    Award all available damages, including but not limited to compensatory and consequential damages, harm to reputation, lost revenue, and lost business opportunities resulting from Justice Moraes's interference.

6.    Grant such other and further relief as the Court may deem to be just and proper.

Dated: June 6, 2025                Respectfully submitted,

By:    _____
       E. Martin De Luca*
       BOIES SCHILLER FLEXNER LLP
       55 Hudson Yards
       New York, NY 10001
       (212) 446-2300
       mdeluca@bsfllp.com

       *Lead Counsel for Plaintiff*
       *Rumble Inc.*

       Matthew L. Schwartz*
       BOIES SCHILLER FLEXNER LLP

55 Hudson Yards
New York, NY 10001
(212) 446-2300

Andrew H. Smith*
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. NW
Washington, DC 20005
(202) 274 1163

Daria Pustilnik
FLA. BAR NO. 92514
BOIES SCHILLER FLEXNER LLP
100 S.E. 2nd Street, Suite 2800
Miami, Florida 33131
(305) 539-8400

*Counsel for Plaintiff Rumble Inc.*



_____
Caryn G. Schechtman*
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
caryn.schechtman@us.dlapiper.com
(212) 335-4500

*Lead Counsel for Plaintiff*
*Trump Media & Technology Group*
*Corp.*

Christopher G. Oprison
DLA Piper LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
(305) 423-8500

*Counsel for Plaintiff*

*Trump Media & Technology Group Corp.*

*\*Admitted pro hac vice*